**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**June 10, 2019**

**FOR THE TENTH CIRCUIT**

_____

**Elisabeth A. Shumaker**
**Clerk of Court**

RONSON KYLE BUSH,

        Petitioner - Appellant,

v.

MIKE CARPENTER, Warden, Oklahoma
State Penitentiary,

        Respondent - Appellee.

No. 16-6318

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:13-CV-00266-R)**

_____

Josh Lee, Assistant Federal Public Defender, Office of the Federal Public Defender for
the District of Colorado, Denver, Colorado (Virginia L. Grady, Federal Public Defender,
Office of the Federal Public Defender for the District of Colorado, Denver, Colorado, and
Mark Henricksen, Henricksen & Henricksen, Oklahoma City, Oklahoma, with him on the
briefs), appearing for Appellant.

Caroline E.J. Hunt, Assistant Attorney General (Mike Hunter, Attorney General of
Oklahoma and Jennifer J. Dickson, Assistant Attorney General, with her on the brief),
Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma,
appearing for Appellee.

_____

Before **BRISCOE**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Petitioner Ronson Bush is an Oklahoma state prisoner who pleaded guilty to first-degree murder and was sentenced to death.  After exhausting his state court remedies by way of a direct appeal and an application for state post-conviction relief, Bush filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The district court denied Bush's petition, and also denied him a certificate of appealability (COA).  Bush appealed and we subsequently granted him a COA with respect to five issues.

In the first of those issues, Bush asserts that the state trial court violated his due process rights by allowing the prosecution to make an offer of proof from a jailhouse informant regarding incriminating statements allegedly made by Bush.  We conclude, however, that Bush has failed to identify any clearly established federal law applicable to this claim, and thus he is not entitled to federal habeas relief under the standards of review outlined in § 2254(d).

In his second issue, Bush argues that the admission of improper victim impact testimony, including requests by the victim's family members for the death penalty, violated his rights under the Eighth and Fourteenth Amendments.  We agree with Bush that the admission of this testimony amounted to constitutional error, but we conclude, after considering all of the evidence that was presented at his sentencing hearing, that the error did not have a substantial and injurious effect or influence in determining the sentence that was imposed by the state trial court.

In his third issue, Bush argues that his trial counsel was ineffective for failing to object to the admission of the unconstitutional victim impact testimony.  Having concluded that Bush was not prejudiced by the admission of this testimony, we in turn

conclude that Bush was not prejudiced by his trial counsel's failure to object to the testimony.

In his fourth issue, Bush argues that his direct appeal counsel was ineffective for failing to argue that trial counsel was ineffective for failing to challenge the constitutionality of an Oklahoma statute that bars capital defendants who plead guilty from being sentenced by a jury. The state appellate court rejected this issue on the merits, and we conclude that its decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

In his final issue, Bush argues that he is entitled to federal habeas relief on the basis of cumulative error. We conclude, however, that Bush has failed to establish actual prejudice resulting from the constitutional errors he has identified.

Therefore, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's denial of federal habeas relief.

## I

*The underlying facts of Bush's crime*

The Oklahoma Court of Criminal Appeals (OCCA) summarized the relevant underlying facts of Bush's case in addressing his direct appeal:

> On the evening of December 22, 2008, while at Billy Harrington's home, Ronson Bush shot Harrington six times with Harrington's .357 caliber revolver. Harrington made it to the front yard of the home, where he collapsed. Bush then tied Harrington to the back of his pickup and dragged him into a field near the house.
>
> By all accounts, Harrington and Bush had been best friends for a number of years. Harrington did what he could to aid Bush who dealt with addictions, paranoia, and other related mental illnesses. Harrington's final attempts to

3

assist Bush came just days before the shooting.  On December 18, Harrington attempted to take Bush to Griffin Memorial Hospital in Norman, Oklahoma but Bush was exceedingly drunk, and the two men fought during the trip.  Harrington left Bush in a parking lot in Norman, and drove on to Tulsa for work.  Bush hitched a ride back to Harrington's trailer.  When Harrington arrived home that evening, accompanied by Jimmy Barrington, they found Bush passed out on the couch with Harrington's firearms purposefully placed around the house.

After calling the sheriff's office to send someone to the house, Harrington again agreed to take Bush back to Griffin Memorial Hospital, where Bush voluntarily admitted himself for treatment.  Bush, however, on December 22, checked himself out of the hospital, called Harrington for a ride, and returned to Harrington's home.  Bush drank vodka from a pint bottle purchased in Blanchard on the way home.  Once home, both men shot guns off the porch and played with Harrington's dog.  Harrington also gave Bush a haircut.

Sometime around 7:15 p.m., Harrington was talking on the phone with his girlfriend who could hear Bush in the background.  Bush took a photograph of Harrington and nothing seemed amiss; minutes later, however, Bush shot and killed Harrington.

Bush explained that things started downhill when he mentioned getting Christmas presents for Stephanie Morgan, an ex-girlfriend, and her son. Bush said that Harrington told him that he should forget about Morgan as she was sleeping with other people.  According to Bush, Harrington went on to say that even he had "fucked" her.  Bush said he then snapped, picked up the .357 revolver, and started shooting Harrington.  Bush kept shooting as Harrington got up, went to the kitchen, collapsed, then got up and walked outside.

At around 7:44 p.m. Harrington's mother, Kathy Harrington, tried to call Harrington's cell phone, but Bush answered.  Bush kept putting Mrs. Harrington off, probably because Harrington was already dead.  Mrs. Harrington called friends who went to the home and discovered Harrington's body in the field.

Bush, in the mean time [sic], left the trailer in Harrington's truck, bought some beer, and drove to Ms. Morgan's home.  Bush kicked in the back door and entered Morgan's unoccupied home.  He waited on her to arrive and drank some alcohol from a commemorative bottle she had stored in her bedroom.

Morgan arrived home and was unable to turn on the bedroom lights.  She heard Bush say that he heard her come in.  Bush was in the bedroom lying on the bed.  Morgan tried to get away by walking out and getting in her car.  Bush, however, got in the passenger side.  Morgan was finally able to let someone know that Bush was there, get him out of the car, and drive away.

Authorities arrived at Morgan's home, and Bush was arrested for violating a protective order Morgan had against him.  Bush, at the time of the arrest, confessed to shooting Harrington.

Bush v. State, 280 P.3d 337, 342–43 (Okla. Crim. App. 2012) (Bush I) (paragraph

numbers and footnotes omitted).

*Bush's state trial proceedings*

The OCCA in Bush I also summarized Bush's ensuing state trial proceedings:

Bush[ ] was charged with first degree murder in violation of [Okla. Stat. tit. 21, § 701.7(A)], and possession of a firearm after former conviction of a felony in violation of [Okla. Stat. tit. 21, § 1283], in Grady County District Court case number CF–2008–371.  The State filed a Bill of Particulars regarding the punishment for first degree murder, which alleged three aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel; (2) there exists a probability that the defendant would commit criminal acts of violence such that he would constitute a continuing threat to society; and (3) the murder was committed by the defendant while he was serving a sentence of imprisonment on a conviction for a felony. [Okla. Stat. tit. 21, § 701.12(4), (6), (7)].

Bush proceeded to trial on October 19, 2009, before the Honorable Richard G. Van Dyck, District Judge.  After the State had presented its second witness, on October 22, Bush expressed his desire to enter a blind plea.  The trial court conducted a plea hearing and allowed Bush to enter an *Alford* plea to first degree murder and a guilty plea to possession of a firearm after former conviction of a felony.  The next day a non-jury sentencing proceeding commenced pursuant to [Okla. Stat. tit. 21, § 701.10(B)].  Sometime during the first day of sentencing, Bush told the trial court that he wanted to withdraw his pleas, but the trial court denied his motion and advised him to wait until after being sentenced to move to withdraw the plea.  At the conclusion of sentencing trial Judge Van Dyck found the existence of all three aggravating circumstances and assessed

punishment at death on the first degree murder; the trial court assessed a
life sentence on the firearm charge.

After being sentenced, and within the requisite ten day period, Bush filed a
motion to withdraw his plea on November 9, 2009 . . . .  The trial court held
a hearing on the motion and, at the conclusion of the hearing, denied the
motion.

Id. at 341–42 (paragraph numbers and footnote omitted).

*Bush's direct appeal*

Bush filed a direct appeal, asserting ten propositions of error.  On June 19, 2012,

the OCCA issued a published opinion affirming Bush's convictions and sentences for

first degree murder and possession of a firearm after former conviction of a felony.

Bush filed a petition for writ of certiorari with the United States Supreme Court.

That was denied on March 4, 2013.  Bush v. Oklahoma, 568 U.S. 1216 (2013).

*Bush's application for state post-conviction relief*

On January 17, 2012 (while his direct appeal was still pending before the OCCA),

Bush filed an application for state post-conviction relief asserting nine propositions of

error.  Bush also filed an application for evidentiary hearing on the ineffective assistance

of counsel claims asserted in his application for state post-conviction relief.

The OCCA denied Bush's application for state post-conviction relief and his

related motion for evidentiary hearing in an unpublished opinion issued on October 1,

2012.  Bush v. State, Case No. PCD 2010-399 (Okla. Crim. App.  Oct. 1, 2012) (Bush

II).

*The federal habeas proceedings*

On March 18, 2013, Bush initiated these federal habeas proceedings by filing a motion for appointment of counsel and a motion for leave to proceed in forma pauperis. The magistrate judge assigned to the case granted both motions.

On December 2, 2013, Bush's appointed counsel filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting fifteen grounds for relief. Briefing in the case was completed on July 2, 2014, when Bush filed his reply brief to respondent's answer.

On October 17, 2016, the district court issued a memorandum opinion denying Bush's petition, entered final judgment in the case, and also issued an order denying Bush a certificate of appealability (COA) as to all of the grounds for relief asserted in his federal habeas petition. Bush filed a timely notice of appeal.

This court subsequently granted Bush a COA on five issues.

II

Bush, in accordance with the COA we issued, asserts five issues in this appeal: (1) whether the state trial court violated his due process rights by allowing the prosecution to make an offer of proof from an inmate named Jackie Nash regarding statements allegedly made by Bush to Nash; (2) whether the state trial court violated Bush's constitutional rights by admitting improper victim impact evidence; (3) ineffective assistance of trial counsel for failing to object to the unconstitutional victim impact evidence; (4) ineffective assistance of appellate counsel for failing to argue that Bush's trial counsel was ineffective for failing to challenge the Oklahoma statute that bars capital defendants

7

who plead guilty from having a jury determine their sentence; and (5) cumulative error.

As discussed in greater detail below, we conclude that Bush is not entitled to federal

habeas relief on any of these claims.

*Standard of review*

 "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a

state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the

courts of the State.'" Kernan v. Hinojosa, 136 S. Ct. 1603, 1604 (2016) (per curiam)

(quoting 28 U.S.C. § 2254(b)(1)(A)).  "If the state courts adjudicate the prisoner's federal

claim 'on the merits,' § 2254(d), then AEDPA mandates deferential, rather than *de novo*,

review." Id.  Specifically, this court cannot grant relief unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d)(1)–(2).

 "'Clearly established Federal Law' refers to the Supreme Court's holdings, not its

dicta." Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (citing Williams v.

Taylor, 529 U.S. 362, 412 (2000)).  "A state-court decision is only contrary to clearly

established federal law if it 'arrives at a conclusion opposite to that reached by' the

Supreme Court, or 'decides a case differently' than the Court on a 'set of materially

indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 412–13).  "But a state court

need not cite the Court's cases or, for that matter, even be aware of them." Id.  "So long

as the state-court's reasoning and result are not contrary to the Court's specific holdings, § 2254(d)(1) prohibits [this court] from granting relief."  Id. (citing Early v. Packer, 537 U.S. 3, 9 (2002) (per curiam)).

"A state court's decision unreasonably applies federal law if it 'identifies the correct governing legal principle' from the relevant Supreme Court decisions but applies those principles in an objectively unreasonable manner."  Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)).  "Critically, an 'unreasonable application of federal law is different from an incorrect application of federal law.'"  Id. (quoting Williams, 529 U.S. at 410).  "[A] state court's application of federal law is only unreasonable if 'all fairminded jurists would agree the state court decision was incorrect.'"  Id. (quoting Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014)).

"Finally, a state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'"  Id. (quoting Byrd v. Workman, 645 F.3d 1159, 1170–72 (10th Cir. 2011)).  "But this 'daunting standard' will be 'satisfied in relatively few cases.'"  Id. (quoting Byrd, 645 F.3d at 1172).

*Issue One – the prosecution's "offer of proof" regarding testimony from Jackie Nash*

In his first issue on appeal, Bush argues that his "constitutional rights were violated when the prosecutor told the [trial court] about a litany of damaging and inadmissible statements attributed to [him]" by "a jail inmate named Jackie Nash."  Aplt. Br. at 18.  Although the state trial court ultimately declined to admit Nash's testimony, it

nevertheless asked for and received an "offer of proof" from the prosecutor regarding Nash's testimony.  Bush argues that the state trial court never heard other evidence that refuted Nash's testimony and, most importantly, it would have been impossible for the state trial court, in fixing Nash's sentence, to ignore the offer of proof.

   *a) Facts relevant to the claim*

   On Friday, October 23, 2009, the first day of the sentencing proceeding, the prosecutor advised the trial judge and defense counsel that Jackie Nash, a jailhouse informant, had come forward with evidence pertinent to the case.  Tr. at 1011.  Defense counsel "object[ed] to any endorsement of a witness at this time during the middle of trial."  Id. at 1012.  The trial judge stated that he would resolve the issue the following Monday.

   On Monday, October 26, 2009, the prosecution attempted to call Jackie Nash as a witness.  Id. at 1309.  The defense "object[ed] to the endorsement of this witness and any testimony by . . . Nash."  Id. at 1310.  The defense noted that both the Oklahoma Constitution and the Oklahoma Code of Criminal Procedure required that evidence in aggravation be endorsed and made known to the defendant prior to trial in order to be admissible.  Id.  The defense in turn asserted that they "were first given notice of" Nash's proposed testimony "on Friday in the middle of trial," thus giving them "two . . . weekend days [in] which to prepare" to cross-examine Nash.  Id.  The defense argued that Nash should not be allowed to testify or, in the alternative, that the trial be continued to give them time to prepare to cross-examine him.  Id. at 1311.  The trial judge responded by stating: "In an abundance of caution . . . the Court is going to sustain the

defendant's motion and not allow the testimony" of Nash.  Id. at 1314.  But immediately

thereafter, the trial judge stated to the lead prosecutor: "you may present an offer of

proof."  Id.

The prosecutor proceeded to state as follows:

> Judge, my offer of proof if Mr. Nash was called to testify he would testify he had conversations with Ronson Bush where Ronson Bush told him he – he was manipulative, he deliberately intended to kill Billy Harrington.

> He sat around for a week, week and a half and thought about how he was going to do it.  Then he used some methamphetamine and went to the detox for a few days to get his head straight so he could get his plan together.

> That he planned this.  That he waited for Mr. Billy Harrington to be at his house alone.  He held a gun on him.  Held him hostage basically yelling and screaming at him trying to make him confess to having a sexual relationship with Stephanie Morgan.

> He basically sat over him and taunted him with the gun the .357 while – while the victim Billy Harrington was sitting in his chair.

> That at one point he holds the gun to the shoulder of Billy Harrington in contact wound [sic] pulls the trigger.  Shoots Billy Harrington.  And Billy Harrington reaches forward and puts his hands up and he shoots him again.  Which was – justify and explain – explain the injuries.

> That Mr. Harrington got out of the chair and fell down on the kitchen floor where Mr. Bush shot him again.  And the whole time continuing to taunt him and yell at him.

> Mr. Nash, would say that at some point Mr. Harrington went outside. Mr. Bush told him that he followed him outside and Billy Harrington was still alive when Ronson Bush tied a rope on his feet and drug him until he – until he thought maybe he was dead, his chest was still moving and he drug him approximately 200 yards.

11

Mr. Nash would say if – if the Court would allow him – to call him, Mr. Bush then left and went to Stephanie's. That's when he started getting drunk. That he wasn't even drunk when he started doing these things to Billy Harrington. He waited until afterwards to get drunk so he would have a defence [sic] to this crime of intoxication.

He will testify about how Ronson Bush was confronted with Stephanie, how she was scared. How she got in the car with Stephanie. And at one point he got out of the car and then she left. Which would be extremely consistent with Stephanie Morgan.

He will also testify Bush bragged about his two previous escape attempts where he used other inmates to help him in the cells. This Court's heard some of that evidence.

And then thirdly, he will say during the course of this trial and leading up to it Ronson Bush was planning a third escape. That he had manipulated his toilets manipulated his – his showers. He caused damage to those cells thinking he could get out behind the toilet behind the shower and dig out of his cell.

And if that didn't work he would escape on his way to Court. He would overpower a jailer, a guard, he would kill whomever was necessary to get away.

He said his uncle was involved with the mafia, and his uncle was going to help him escape from here and he would never be able to see his family again but that he would blame it on the Mexican Mafia in the city because nobody would suspect his uncle for helping him escape. That if he had to kill people to get out of this courtroom and to get out of here that's what he would do.

He said he showed no remorse. He laughed about killing Billy Harrington. And that would be my proffer.

Id. at 1314–17.

Defense counsel then stated: "Judge, I – I in an abundance of caution this is a

proffer and you're sitting off of our judgement [sic] of facts and I would just ask that the

Court please consider it and put it in it's [sic] proper place." Id. at 1317.  The trial judge

responded: "Any argument or statement by counsel is not evidence." Id.

   *b) The OCCA's disposition of the claim*

   In Proposition IV of his direct appeal brief, Bush argued that the trial judge's

consideration of the offer of proof prejudiced Bush's rights under the Sixth, Eighth, and

Fourteenth Amendments.  Direct Appeal Br. at 46.  Specifically, Bush argued that the

"offer of proof was extremely harmful to [his] case for life" because it "was in direct

contrast to [his] own account of the crime as an unplanned, unpremeditated reaction to

Mr. Harrington's revelation of an affair with Ms. Morgan, and that the shooting was

something about which he was deeply saddened and almost ill." Id. at 49.  Bush further

argued that, "[a]lthough the trial judge assured defense counsel that statements by

counsel were not evidence, this offer of proof was far too inflammatory for the trial judge

to disregard." Id. (citation omitted).  That was because, Bush argued, the offer of proof

"ma[d]e the case for a planned, premeditated murder replete with torture and accounts of

[Bush's] morbid delight," as well as "references to escape attempts and threats by . . .

Bush against jailers and court personnel."[1] Id. at 50.

---

   [1] On the same day Bush filed his appellate brief, he also filed an application for
evidentiary hearing on Sixth Amendment claims in which he alleged, in pertinent part,
that "his trial counsel had a duty to ask the judge to recuse from the case based on his
inability to decide the case impartially once the offer [of proof] was made."  App. for
Evid. Hr'g at 7.

The State, in its response brief, argued that the "issue [wa]s not preserved for review as it was not contained in the motion to withdraw the plea."[2]  State Direct Appeal Br. at 36–37.  In support, the State noted that OCCA Rule 4.2(B) provided that "'[n]o matter may be raised in the petition for writ of certiorari unless the same has been raised in the application to withdraw the plea . . . .'"  Id. at 37 (quoting Okla. Crim. App. R. 4.2(B)).  The State also argued, in the alternative, that "the trial court assured [Bush] the offer of proof was not evidence" and that Bush "ha[d] completely failed to demonstrate that despite such assertion, the trial court relied on the offer of proof when it determined [he] was a continuing threat to society and that the murder was especially heinous, atrocious or cruel."  Id.

The OCCA ultimately denied relief on the claim.  In doing so, the OCCA stated as follows:

> In addition to arguments attacking the aggravating circumstances, Bush also argues that the trial court's sentencing decision was influenced by improper and inadmissible evidence.  In proposition four, Bush claims that the trial court considered improper testimony from a jail-house snitch during the sentencing proceedings.  The trial court sustained Bush's motion to bar the witness's testimony because no notice was given to Bush regarding the evidence in aggravation.  See [Okla. Stat. tit. 21, § 701.10].  Regardless, Bush argues, the trial court allowed the State to give an offer of proof regarding the expected testimony of informant Jackie Nash.  It is this offer of proof that Bush now argues influenced the trial court, in part, in sentencing Bush to the penalty of death.

---

[2] On November 9, 2009, Bush filed a motion to withdraw his guilty plea.  In that motion, Bush argued that: (1) the plea was entered through inadvertence, ignorance, mistake or coercion; (2) the sentence imposed was excessive and contrary to the evidence presented; (3) he was not mentally competent to enter a plea; (4) he was not mentally competent at the time of the commission of the crimes; (5) the plea was not knowingly and voluntarily entered; and (6) he received ineffective assistance of counsel.

Bush first argues that the offer of proof was improperly given because there was no need for the State to preserve the evidence with an offer of proof, as the State would not be appealing Bush's sentence.  Even if the offer of proof was improperly given, Bush must overcome the presumption that the trial court only considered competent and admissible evidence in reaching its decision.  See Long v. State, 2003 OK CR 14, ¶ 4, 74 P.3d 105, 107.

In Long, the trial court listened to an audio tape during a suppression hearing, after which the trial court suppressed the tape.  The trial court went on to conduct a non-jury trial.  The defendant in Long could not overcome the presumption that the trial court did not consider improper evidence during the trial.  Id.

Here, the evidence proffered was intended to support the continuing threat aggravating circumstance.  The State indicated that Nash would testify that Bush told him that he deliberately intended to kill Harrington and had planned it for several days; he went to detox to get his head straight before carrying out his plan; he held him hostage trying to make him confess to having a sexual relationship with Morgan; he finally shot Harrington in the arm while holding the gun to Harrington's shoulder; Harrington reached forward and Bush shot him again.

Bush told him that Harrington went outside and Bush believed that Harrington was still alive when he dragged him behind the pickup; Bush said he wasn't drunk, but drank afterward and intended to use intoxication as a defense; according to Nash, Bush bragged about his escape attempts; he planned a third escape by digging around the toilet and shower, damaging them; he said he intended to escape on his way to court and kill a guard or whomever necessary in order to get away.  Nash indicated that Bush showed no remorse and laughed about killing Harrington.

The offer of proof contained evidence otherwise unknown through other admissible channels.  The new evidence included Bush's account of the events of the killing and the planning of the killing-in contrast to his claim that the killing was a spur of the moment killing brought on by Harrington's boasting of sexual acts with Morgan.  The evidence of the damage to the toilet and shower area was confirmed as an escape attempt by this offer, and further, Bush's statement that he intended to flee from court and kill if necessary to escape were not available from other testimony.

15

Bush claims that this evidence was so prejudicial that it was impossible for the trial court to ignore.  Although the offer contained powerful evidence, there is little indication that the trial court utilized this evidence in making a sentencing decision.  As Bush points out, the trial court did cite to the instances of attempted escape as factoring into the basis for a finding that the probability existed that Bush would be a continuing threat to society.  Other admissible evidence, however, provided sufficient evidence that Bush was attempting to escape from the Grady county jail.

To overcome waiver claims regarding this offer of proof, Bush claims counsel was ineffective in its ability to preserve Bush's rights to a proceeding free from outside influences and prejudices.  The ineffective assistance claim must also fail, because there is no evidence that the trial court utilized this information in determining the sentence.

As a side note, it is possible that this testimony might have been admissible as rebuttal evidence, and no discovery notice would have been required–depending on the reliability of the jailhouse informant testimony.

Bush I, 280 P.3d at 348–49 (paragraph numbers and footnote omitted).

It is not entirely clear whether the OCCA intended to resolve the claim on the merits or, instead, to resolve it on the basis of procedural bar.  The OCCA's discussion, in large part, is devoted to explaining why Bush was not prejudiced by the alleged error – and thus, the OCCA seems to have resolved the issue on the merits.  But the OCCA's references to "overcom[ing] waiver" also suggest that it may have deemed the claim procedurally barred due to Bush's failure to raise the issue in the trial court.

*c) Procedural bar*

Respondent asserts that Bush "raises several new arguments" in his appellate brief "that were neither raised to the OCCA or the district court."  Aple. Br. at 19.  To begin with, respondent asserts that Bush, in his direct appeal, attempted "[t]o show the trial court considered the offer of proof" by arguing "only that testimony at trial regarding

16

[his] attempts to escape from jail was insufficient for the trial court to find [he] attempted to escape" and "therefore the trial court must have relied on the Nash offer of proof." Id. at 18.  Respondent in turn asserts that in federal district court, Bush "attempted to prove the trial court considered the proffer by arguing two points – (1) [his] efforts to escape, and, (2) that an investigator observed the trial court's demeanor change when the offer of proof was read." Id. at 18–19.  Respondent notes that Bush now "claims the OCCA's holding was an unreasonable application of several different Supreme Court cases that he failed to either present to the OCCA or to the district court." Id. at 19.  "Likewise," respondent asserts, "he raises several new arguments that were neither raised to the OCCA or the district court, in an effort to show . . . the trial court relied on the Nash proffer." Id.  Ultimately, respondent argues that Bush "is limited to the arguments and facts he presented to the OCCA." Id.

We agree with respondent.  The only arguments that Bush made before the OCCA were that the offer of proof was improper under Oklahoma law (i.e., "there was no discernible need for the prosecutor to make an offer in order to preserve the error"), the "offer of proof was far too inflammatory for the trial judge to disregard," and the trial judge ultimately relied on the offer of proof in finding that the trial judge found that Bush "had 'attempted and/or conspired to escape from the Grady County Jail.'"  Direct Appeal Br. at 48–49, 52.  As for the last of these arguments, Bush argued that "[b]y making this finding, the trial judge had to have relied on the . . . Nash offer of proof, because, otherwise, there was no evidence demonstrating that . . . Bush was the person who

17

tampered with the shower and toilet" in his jail cell.[3]  Id. at 52.  At no point did Bush

argue before the OCCA, as he does now in this federal habeas appeal, that (1) the trial

judge allowed the offer of proof because "he wanted to hear" Nash's allegations, (2)

"direct evidence indicates that the [trial] judge was emotionally affected by the

allegations," (3) "Nash's statements demonstrably affected later testimony that the judge

heard from the victim's family, who were present through the trial and would have heard

the 'offer of proof,'" or (4) "just a few weeks after the sentencing, the prosecutor

submitted a letter for use in . . . Nash's federal criminal proceedings" that stated "that

'Nash's cooperation and information was [sic] very valuable in the Bush prosecution.'"

Aplt. Br. at 25–28.

　　　Thus, the new arguments that Bush now asserts in his federal habeas appeal are

unexhausted and, in turn, procedurally barred.  The OCCA has long and consistently held

that "issues that were not raised previously on direct appeal, but which could have been

raised, are waived for [purposes of] further [state] review."  Logan v. State, 293 P.3d 969,

973 (Okla. Crim. App. 2013).  Thus, were Bush to return to Oklahoma state court and

present these new arguments in a successive application for post-conviction relief, those

arguments would be deemed waived by the OCCA.  All of which means that those new

arguments are procedurally barred for purposes of these federal habeas proceedings.  See

---

[3] Bush conceded in his direct appeal brief, however, that the trial judge heard testimony from Shane Wyatt, the jail administrator, "that the toilet in . . . Bush's single-man cell had been tampered with in an apparent attempt to escape."  Direct Appeal Br. at 52.  Although Bush noted that Wyatt admitted on cross-examination "he did not see who did the damage, nor had he filed any incident reports on the damage," the trial judge could reasonably have inferred that Bush was responsible for the damage.  Id.

Williams v. Trammell, 782 F.3d 1184, 1212 (10th Cir. 2015) ("[A] habeas petition is

procedurally defaulted if the petitioner failed to exhaust state remedies and the court to

which the petitioner would be required to present his claims in order to meet the

exhaustion requirement would now find the claims procedurally barred." (quotation

marks omitted)).

   *d) Clearly established federal law applicable to the claim*

   Bush concedes that "[n]o Supreme Court case specifically addresses prejudicial

'offers of proof,'" but he asserts that "[s]everal lines of Supreme Court precedent

establish general standards that support relief here." Aplt. Br. at 21. To begin with, Bush

points to Supreme Court precedent addressing state-sponsored courtroom practices that

may be "so inherently prejudicial that [they] deprive[] a defendant of a fair trial." Carey

v. Musladin, 549 U.S. 70, 76 (2006) (concluding that buttons displaying the victim's

image worn by the victim's family during respondent's trial did not deny respondent his

right to a fair trial). The two main examples are Estelle v. Williams, 425 U.S. 501, 502

(1976), where the defendant "appeared at trial in clothes that were distinctly marked as

prison issue," and Holbrook v. Flynn, 475 U.S. 560 (1986), where the State seated four

uniformed state troopers in the row of spectators' seats immediately behind the defendant

during trial. The Court held in both cases that government-sponsored practices of these

types can, depending on the circumstances, be so inherently prejudicial that they deprive

a defendant of a fair trial. Secondly, Bush points to Greer v. Miller, 483 U.S. 756 (1987),

in which the Supreme Court "recognized that prosecutorial misconduct may so infect the

trial with unfairness as to make the resulting conviction a denial of due process," and

that, "[t]o constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. at 765 (quotations and brackets omitted).  Third, Bush points to the Supreme Court's recognition in Romano v. Oklahoma, 512 U.S. 1, 12 (1994), that the "admission of evidence" might "so infect[] the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process."  Lastly, Bush points to Parker v. Dugger, 498 U.S. 308, 321 (1991), in which the Supreme Court recognized (as it had before) that "[t]he Constitution prohibits the arbitrary or irrational imposition of the death penalty."  Together, Bush argues, "[t]hese cases establish that the due process clause prohibits fundamental unfairness and that the Eighth Amendment forbids arbitrariness in death penalty proceedings."  Aplt. Br. at 22.

The threshold question we must address is whether Bush has identified a rule of law that was "clearly established" by the Supreme Court at the time the OCCA resolved his direct appeal.  See House v. Hatch, 527 F.3d 1010, 1018 (10th Cir. 2008) (holding that, in light of Musladin, a court must first determine whether the petitioner seeks to apply a rule of law that was clearly established by the Supreme Court at the time his or her conviction became final).  In House, this court held that "Musladin instructed that Supreme Court holdings—the exclusive touchstone for clearly established federal law— must be construed narrowly and consist only of something akin to on-point holdings."  Id. at 1015.  In other words, "in the post-Musladin analysis, clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*."  Id. at 1016.

20

That presents a problem for Bush.  None of the Supreme Court cases he has cited in his appellate brief involved facts remotely similar to the facts at issue in his case, i.e., a trial judge who selected and imposed a death sentence after considering an offer of proof of inadmissible aggravating evidence.  Indeed, none of the cases he has cited separately involved either the consideration of an offer of proof of inadmissible evidence in any context, or a capital case.  Thus, at best, the cases cited by Bush stand for very broad principles of due process.  In light of <u>Musladin</u> and <u>House,</u> however, that is not sufficient to constitute clearly established federal law for purposes of § 2254(d).  And, under <u>House,</u> "[t]he absence of clearly established federal law is dispositive under § 2254(d)(1)."  527 F.3d at 1018.

<em>Issue Two – admission of victim impact testimony</em>

In his second issue on appeal, Bush argues that the admission of victim impact testimony at his sentencing hearing violated his rights under the Eighth and Fourteenth Amendments.[4]  More specifically, Bush argues that this testimony violated his

---

[4] In his opening brief, Bush cites to the Fourteenth Amendment several times in connection with Issue Two, and ultimately argues that he is entitled to federal habeas relief under the Fourteenth Amendment on Issue Two.  Aplt. Br. at 34, 50, 58–60.  The problem, however, as respondent correctly notes, is that Bush failed to make these same, or indeed any, arguments regarding the Fourteenth Amendment in his habeas petition.  To be sure, Bush cited to the Fourteenth Amendment in connection with his challenge to the admission of the victim impact testimony.  Dist. Ct. Docket No. 20 at 41.  But nowhere in his habeas petition did Bush explain how the admission of the victim impact testimony resulted in a violation of his Fourteenth Amendment rights.  Nor did he attempt to argue that the OCCA's decision was contrary to Supreme Court precedent interpreting the Fourteenth Amendment.  Consequently, we conclude that Bush has forfeited his Fourteenth Amendment arguments.  <u>See</u> <u>Hancock v. Trammell</u>, 798 F.3d 1002, 1011

21

constitutional rights because it included "family members' characterizations of the crime, opinions about [him], and desire for the death penalty."  Aplt. Br. at 34.

    *a) Facts relevant to this claim*

On September 14, 2009, the prosecution filed a pleading with the state trial court entitled "State's Notice and Disclosure of Victim Impact Statements."  State Court ROA, Vol. 2 at 213.  Attached to that pleading were the written victim impact statements from eight of the victim's family members.

The victim's parents, Kathleen and David Harrington, stated in their joint victim impact statement: "Billy died at the hands of his enemy, although he called him friend.  Billy endured pain and agony; was dragged as if he were trash and left to freeze in the frigid dark of night."  Id. at 218.  They also stated, with regard to the punishment of Bush: "In the death of our Billy we are making a plea to the court requesting the maximum sentencing; the most severe punishment by law.  We are requesting death for Ronson Kyle Bush.  The request is not made for the desire of vengeance but we all firmly believe that Ronson is a threat and will continue to be a threat to our family and the community in general."  Id. at 219 (emphasis omitted).

Rebecca Harrington Latorre, the victim's sister, wrote in her statement that "Ronson Bush deserves the most severe punishment allowed by Oklahoma law.  He deserves the death penalty."  Id. at 221.

--------

(10th Cir. 2015) (concluding that habeas petitioner forfeited argument by not raising it in federal district court).  Further, because Bush has not asserted plain error in connection with his Fourteenth Amendment arguments, "we do not engage in plain-error review." Id.

Lois Montgomery, the victim's grandmother, offered the following

recommendation regarding punishment:

> With premeditation, systematically with cruelty and maliciousness
> Billy was murdered, shot multiple times and obtained numerous wounds,
> burns, and trauma to his entire body and precious face.  He was dragged
> and disposed of like so much garbage.  Bush without thought of friend or
> his family inflicted pain and death upon our sweet Billy.  I plead with the
> court to sentence Ronson Bush with the maximum sentence possible; I
> request the death penalty.

Id. at 222.

Kaci Harrington, the victim's then-eleven-year-old daughter, provided a

handwritten statement that included the following recommendation regarding sentencing:

"Today my plea to the court is to consider the cruelty and abuse that my Daddy suffered

because of Ronson, [sic] is to give the maximum sentence possible to Ronson Kyle

Bush."  Id. at 229.

Ashlee Dickey, a first cousin of the victim, wrote in her statement:

> I would have to recommend Ronson Kyle Bush face death or spend
> the rest of his life imprisoned.  Based upon his crime against Billy
> Harrington, he proves he is a dangerous and heartless human being.
> Considering the fact he has a criminal past before this horrific crime, he
> proves he is not worthy or capable of living and functioning in a society of
> law and order.  I feel that even with imprisonment, he will be provided a
> life which is much more respectable than what he deserves after the
> gruesome murder of my dear cousin, Billy Harrington.  And if death is his
> punishment, a much easier way to leave this world than the option HE gave
> Billy.

Id. at 234 (emphasis in original).

Traci Carter, the mother of the victim's daughter, wrote in her statement regarding

the punishment of Bush:

23

As for my recommendation on punishment for Ronson Kyle Bush, it is based on many things. Such as the loyalty Billy showed for Ronson up until the end. Billy was the only true friend Ronson has, yet Ronson brutally tortured and murdered him, even choosing to drag Billy's bleeding body with Billy's own truck and dumping him! To do that to anyone is unimaginable, but the fact that Ronson chose to do that to his long time friend, the one person who never gave up on him, shows a total lack of humanity in Ronson. It shows only pure evil. The fact that he did such a horrible thing to Billy proves that no one's life is sacred to Ronson, no one is safe from his cruelty and lack of regard for anyone but himself. He is an obvious threat to society. Now Kaci and I, Billy's parents, his siblings, our extended families, and his many, many friends, have to life [sic] without Billy, because of Ronson and his evil actions. I recommend the maximum punishment and its enforcement for Ronson Kyle Bush, I recommend the death penalty.

Id. at 239.

Lastly, the victim's brother, Bobby Harrington, provided a long written victim

impact statement. It included the following:

There is an old Indian folklore about a young Indian brave who while hunting came across a poisonous snake. The snake spoke to the Indian brave and asked him to pick him up and hold him close to his body so the snake could warm up. The little brave replied back, you are a snake and everybody knows you will bite me. The snake answered back, I promise I won't bite you. Reluctantly, the little Indian brave picked up the snake and held him close to his body, soon after warming up the snake bit the Indian brave injecting his poisonous venom into him. The little Indian brave threw the snake down and shouted, you said you would not bite me to which the snake replied: you knew I was a snake before you picked me up.

Ronson Bush is that snake, spineless, cowardly and deceitful. He sought my brothers [sic] help and Billy not one to turn a friend away offered help to Ronson time and time again, knowing the possible danger of helping such a person.

. . . .

You ask me what I think ought to be the punishment for Ronson Bush? I can't tell you what I really think should happen to him. It seems our system protects the offender more than the victim and as such, it is not

24

advisable for me to say or state it in writing what I would like to say.  That being said, I believe the punishment should be the maximum allowed by law and ask that Ronson be sentenced to death by lethal injection.  Looking at the evidence presented in this case I ask that your decision be based on the need for justice and protection of others.  If just punishment is not given, Ronson Bush will kill again and it could be his own family member or a family member of the courts; what would be recommended then?

Id. at 242–43.

On October 8, 2009, Bush filed a response to the prosecution's Notice and Disclosure of Victim Impact Statements.  Id., Vol. 3 at 500.  In that response, Bush objected to specific portions of each of the victim impact statements.  For example, he argued that the references in Kathleen Harrington's statement "to the crime as being 'brutal'" were "an improper characterization of the crime."  Id.  Bush also argued that the recommendations that he be given the death penalty were violative of the Eighth Amendment.  Id. at 502.  In addition, Bush challenged other miscellaneous aspects of the statements.

The state trial court did not rule on Bush's objections prior to trial.  At the sentencing hearing, defense counsel mentioned the objections just prior to the prosecution presenting the victim impact statements as part of its case-in-chief.  Specifically, defense counsel made the following statement and the state trial court responded as follows:

[DEFENSE COUNSEL]:  And, Judge, I think we just had a little housekeeping matter to take care of.  And I think we're going to be doing Victim Impact.

And we – we had filed a response to the Cargill response and we know we're in front of you [and] not in front of a jury.  But we're just renewing that we did do a response and we're, you know, asking that the victim impact be kept to the statute that's all.

25

THE COURT:  Okay.  State's real good about doing that.

[PROSECUTOR]:  Judge?

THE COURT:  I said the State's real good about doing that, keeping the statute.

[PROSECUTOR]:  Yes.

THE COURT:  I know you take pains to make sure.

Tr. at 1406–07.

Immediately thereafter, the prosecution began presenting victim impact testimony from Harrington's family members.  That essentially involved the family members reading their written victim impact statements or testifying in a manner equivalent to the written statement, followed by exchanges between the prosecutor and each witness, except for the victim's young daughter, regarding their recommended sentence for Bush.

Rebecca Latorre, Harrington's younger sister, gave the following response when asked by the prosecutor if she "ha[d] a recommendation for the Judge on what type of punishment – or what sentence [he] should say Ronson Bush should receive":

> Judge, Billy died at the hands of pure evil.  Ronson killed with total disregard for the only person who continued to care about him.
>
> Ronson antagonized and tortured my brother.  Billy's body was bludgeoned and ripped apart by jealous and angry bullets.
>
> Billy was dragged and disposed of like household trash.  Ronson Bush deserves the maximum sentence possible.  Ronson Bush deserves death.

Tr. at 1412.

26

Bobby Harrington, the victim's older brother, was asked by the prosecutor what his sentencing recommendation would be.  In response, he gave a very long answer that touched initially upon his view of the crime:

> On that very evening December 22, 2008 Ronson repaid my brother Billy by shooting him six times, emptying Billy's own gun on him, calculating, disarming him.  Chasing him down from behind while my brother with unbelieve [sic] endurance and pain struggled to flee his own house.
>
> Into the cold night Billy fled bearfoot [sic] and helpless with Ronson following him and inflicting purposeful, tortuous pain.
>
> Following these evil acts Ronson tied a rope around my brother's right ankle and drug him to the backside of Billy's own property.  Continuing to inflict facial and body damage with traumatic damage.
>
> Using Billy's truck Ronson attempted to discard his evil malicious deeds and destruction of our dear Billy.
>
> He stole Billy's identification, money, and truck, and fled after locking the front door and turning out the lights.
>
> You ask me what I think ought to happen – what ought to be the punishment for Ronson Bush?

Id. at 1423–24.  The following colloquy then occurred between the prosecutor, Bobby Harrington, and the trial judge:

> [PROSECUTOR:]  And you pause, there.  Bobby, you've been very angry throughout this whole case; is that right?
>
> [THE WITNESS:]  Yes.
>
> . . . .
>
> [PROSECUTOR:]  Has at times he smiled and mocked the family?
>
> [THE WITNESS:]  He has mocked the family.  He's a fake.  He's setting [sic] over there crying like a little puppy dog like there's something

wrong with him like he's sorry.  He's not sorry.  I can't believe I even had any compassion for him the day he even signed his right whenever he pleaded guilty.  A tinge of me, a hope thinking, well, maybe he had some compassion, maybe he does – is really doing this, but he's not.

[PROSECUTOR:]  That being said, what is your recommendation to the Court for punishment of Ronson Bush?

THE WITNESS:  I guess you won't take the handcuffs off of him and let me take care of it?

THE COURT:  Sorry.  I can't do that.

THE WITNESS:  I didn't think you would, but I had to ask.

THE COURT.  Thank you.

THE WITNESS:  It seems our system protects the offender more than the victim.  And as such, it is not advisable for me to say – well, I done asked you what I was gonna – what I was thinking anyway.

But that being said, Judge, I believe the maximum punishment allowed by law is that you sentence Ronson Bush to death by legal injection.

Id. at 1424–25.

David Harrington, the victim's father, gave the following response when asked by

the prosecutor, "What do you think should happen to Ronson Bush?":

I know, Judge, that being as he's – Ronson has taken this away from the jury to decide, he's – he's put it on you.  And I know you must feel a burden.

But I want you to know, that decision is just not your's [sic].  We're making that decision with ya.  And I don't want you to feel like it all comes down to just you because we're the ones that's – that's suffered the loss.

And I know so many times the justice system fails victims and their families.  But I just ask, Judge, this time that the justice system won't fail our family.

28

And the maximum that this State allows for this crime, and I believe that the maximum was put in place for just this type of crime, and the maximum is far to [sic] easy.

Where they strap you down and put a needle in your arm and you go off to sleep and never wake up.  That's – that's too easy.

The bible says, "A man reaps what he sews [sic] and where there's no mercy no mercy will be shown."

I believe he's sown what he should – what he should reap.  And I don't believe that there is any place for any mercy in a crime like this.  And I recommend, Judge, that you give him the death penalty.

Id. at 1436.

Lastly, Kathy Harrington, the victim's mother, read her victim impact statement,

which included the following references to her views of the crime:

And on the night of December the 22nd, 2008 recorded as December the 23rd, with total disregard of life and friendship, Ronson, with pre-thought and brutal maliciousness completed murder shooting our Billy multiple times causing irreparable damage and death.

As Billy attempted to gain safety after being shot while in his own home stumbled into the freezing night losing his life-giving blood.

Ronson, you didn't stop with shooting him.  You then tied a rope around my son's foot and you drug him 600 feet causing multiple injuries to a beautiful man.

Id. at 1446.

The prosecutor and Mrs. Harrington then engaged in the following exchange

regarding the proposed punishment for Bush:

Q.  Kathy, I'm fixing to ask you the last question.  The basic one is – is what is your recommendation to the Court regarding sentencing of Ronson Bush?

But before I get there have – have you and the family kind of evolved in your thoughts about the appropriate punishment for Ronson Bush?

A.  Yes.  We have.  We had – had first wanted Ronson to take life without parole.

Q.  And even at first there was some of the family wanted the death penalty; correct?

A.  Yes.

Q.  There was kinda –

A.  Several wanted death penalty.

Q.  Something changed throughout the course of trial in the last nine months that has – has united the family in coming to a recommendation?

A.  The events and what happened to Billy.  The actions of Ronson.

Ronson, I don't believe you're sorry that you killed my son.  I think you enjoyed it.  I think you bragged about it.

And for that reason we have united.  And before I – before I tell you what the plea is – there's something I would like to say to the, Judge, if I may?

Q.  Yes, ma'am.

A.  Thirty-eight years ago on December the 31st, 1971, my father was murdered.  He was shot 14 times with a .9 millimeter, and the man got off.

My belief in the justice system was irreparably damaged.  As I walked into this court today, on the building it reads, "The foundation of justice is that no man shall suffer wrong."

Your Honor, I understand your great responsibility which lies before you.  I pray that my faith may be reassured in the justice system.

And the death of our Billy we are making a plea to the Court requesting the maximum sentencing, the most severe punishment by law.

We know it will not bring our Billy back but we are requesting death for
Ronson Kyle Bush.

Id. at 1447–49.

During closing arguments, the prosecutor referred to the victim impact
evidence: "There's no getting around the victim impact testimony you heard
yesterday.  I been around here a long time, Judge, that – that was hard."  Id. at
1866.  The prosecutor in turn stated: "The only true and just sentence in this case
and you have to know it, you have to feel it, you have to see it is the death penalty
for Ronson Bush."  Id. at 1867.

*b) Clearly established Supreme Court precedent*

Bush points to the Supreme Court's decision in Payne v. Tennessee, 501 U.S. 808
(1991), as supplying the clearly established federal law applicable to his claim.  In Payne,
the Supreme Court held, after reconsidering its prior decisions to the contrary, that the
Eighth Amendment does not bar a State from allowing the admission of victim impact
evidence during the penalty phase of a capital trial.  501 U.S. at 825 ("We are now of the
view that a State may properly conclude that for the jury to assess meaningfully the
defendant's moral culpability and blameworthiness, it should have before it at the
sentencing phase evidence of the specific harm caused by the defendant.").  Notably,
however, the Supreme Court left in place its prior holding "that the admission of a
victim's family members' characterizations and opinions about the crime, the defendant,
and the appropriate sentence violates the Eighth Amendment."  Id. at 830 n.2.

31

*c) The OCCA's disposition of the claim*

In his direct appeal, Bush argued that his death sentence should be vacated because the admission of improper opinion testimony during the presentation of victim impact evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Direct Appeal Br. at ii.  As part of that argument, Bush asked the OCCA "to reconsider its position" regarding "the admission of pleas for death by victims' family members."  Id. at 54.  Bush argued that the OCCA had erroneously interpreted Payne as authorizing the admission of such evidence.  Id. at 55–56.  Bush also argued that, "in any event, [the] emotional pleas for death in [his] case went far beyond the limitations on opinion testimony previously imposed by" the OCCA and "inject[ed] wholly arbitrary and capricious factors into [his] sentencing trial."  Id. at 54.

The OCCA rejected Bush's arguments, stating as follows:

> Next Bush claims, in proposition five, that the trial court's decision was influenced by improper victim impact testimony.  He argues that victim impact testimony contained improper and highly prejudicial opinions about the requested sentence and, in general, victim impact evidence violates the United States and Oklahoma constitutions.  "The decision maker in this case was a judge, not a jury, and unless proven otherwise, we will presume the decisions made with respect to sentencing were in compliance with the law and without passion or prejudice." Marshall v. State, 1998 OK CR 30, ¶ 32, 963 P.2d 1, 11.  Furthermore, Bush failed to preserve any victim impact issues by objecting to the evidence when presented.
>
> Initially, Bush asks this Court to reconsider its previous holding regarding the admissibility of victim's characterizations of the crime and recommendations of an appropriate sentence.  Appellant points out that the holding of Booth v. Maryland, 482 U.S. 496, 508–09 (1987), stating in part that a victim's opinion about an appropriate sentence violates the Eighth Amendment, was not overruled in Payne v. Tennessee, 501 U.S. 808 (1991), because the victim impact evidence in Payne did not contain the

sort of evidence of which Bush now complains.  The Tenth Circuit, according to Appellant, has recognized this holding is still in force.  See Hain v. Gibson, 287 F.3d 1224, 1238 (10th Cir. 2002).

This Court has addressed and rejected this same challenge.  See Jackson v. State, 2007 OK CR 24, ¶ 25, 163 P.3d 596, 603; Murphy v. State, 2002 OK CR 24, ¶¶ 40–45, 47 P.3d 876, 884–85.  Defense counsel failed to raise this specific issue in the trial court; therefore, this court will decline to revisit an issue which was waived in the trial court.

This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence."  See [Okla. Stat. tit. 21, § 142A–1], et seq. [previously [Okla. Stat. tit. 22, § 984]]; Dodd v. State, 2004 OK CR 31, ¶ 95, 100 P.3d 1017, 1044. Section 142A–1 reads in part:

> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence;

Even though admissible, the evidence may be so prejudicial that it creates an unfair trial, thus implicating the Due Process Clause of the Fourteenth Amendment.  Lott v. State, 2004 OK CR 27, ¶ 109, 98 P.3d 318, 346, citing Payne, 501 U.S. at 825, 111 S.Ct. at 2608.

In this case, the victim's family members gave impassioned pleas to the trial court, and they all strenuously demanded that Bush receive the death penalty.  The bottom line is that this Court should only consider whether the victim impact testimony caused the sentence of death to be issued under the influence of passion, prejudice or any other arbitrary factor.  [Okla. Stat. tit. 21, § 701.13].  In doing so, this Court must decide whether Bush has overcome the presumption that the trial court only considered competent and admissible evidence in reaching its decision. See Long, 2003 OK CR 14, ¶ 4, 74 P.3d at 107.

The State admits that the victims did stray beyond a simple opinion about a recommended sentence and elaborated on their reasons for asking for a sentence of death; however, the State points out that a trial court is presumed to know and follow the law. Here, nothing supports a conclusion that the trial court relied on the victim impact testimony in reaching a sentencing decision.

Lastly, Bush asks this Court to reconsider its previous holdings regarding whether victim impact testimony acts as a non-statutory aggravating circumstance. We decline to revisit this issue and continue to hold that victim impact testimony is constitutional and does not act as a "superaggravator." Harmon v. State, 2011 OK CR 6, ¶ 93, 248 P.3d 918, 946.

Bush I, 280 P.3d at 349–50 (paragraph numbers and parallel citations omitted).

*d) Is the claim procedurally defaulted?*

Respondent argues that "the OCCA barred [the] claim because it was not raised to the trial court" and thus the claim is procedurally barred for purposes of federal habeas review. Aple. Br. at 34. Respondent also argues that in federal district court, Bush "did not challenge in his reply Respondent's assertion that his claim was procedurally barred" and "failed to argue cause, prejudice or a fundamental miscarriage of justice entitled his barred claim to be heard." Id. at 34–35.

Addressing these points in order, it is true that the OCCA stated, in part, that "Bush failed to preserve any victim impact issues by objecting to the evidence when presented." Bush I, 280 P.3d at 349. Despite that one-sentence statement, however, the OCCA proceeded to engage in a lengthy review of the claim and ultimately rejected the claim on the merits. And Bush, in the reply brief that he filed in federal district court, noted this very fact: "What Respondent fails to recognize [in arguing procedural bar] is that the OCCA merely noted that 'Bush failed to preserve any victim impact issues by

34

objecting to the evidence when presented' but then went on to review the claim on the merits."  Dist. Ct. Docket No. 39 at 11 (quoting Bush I, 280 P.3d at 349).

In instances where the OCCA has relied primarily on a procedural bar ruling and only alternatively and briefly addressed a claim on the merits, we have abided by the procedural bar ruling.  E.g., Cole v. Trammell, 755 F.3d 1142, 1158–59 (10th Cir. 2014) (acknowledging and applying the OCCA's procedural bar ruling because "the OCCA's primary basis for rejecting . . . claim was that it had been waived" and "the OCCA's sole reason for addressing the claim on the merits was to address and reject Cole's ineffective assistance of appellate counsel claim"); Thacker v. Workman, 678 F.3d 820, 834 n.5 (10th Cir. 2012) ("[W]e must acknowledge and apply the OCCA's procedural bar ruling, even though the OCCA, on an alternative basis, briefly addressed and rejected the merits of Thacker's claim.").  In Bush's case, however, the OCCA's reference to Bush "fail[ing] to preserve any victim impact issues" amounted to one sentence, and the OCCA then proceeded to discuss the claim at length before rejecting it on the merits.

Moreover, we are not persuaded that the OCCA's reference to "Bush fail[ing] to preserve any victim impact issues by objecting to the evidence when presented" was intended by the OCCA as a procedural bar ruling.  The OCCA has long held that, in the absence of a contemporaneous objection, it will review the admission of evidence for plain error.  E.g., Kirkwood v. State, 421 P.3d 314, 318 (Okla. Crim. App. 2018); Lott v. State, 98 P.3d 318, 340 (Okla. Crim. App. 2004).  Thus, at worst for Bush, the OCCA's ruling could be interpreted as reviewing the claim only for plain error.  That said, however, the OCCA made no explicit mention of this general rule, nor did it, in

35

reviewing the claim on the merits, appear to apply a plain error standard of review.  Thus, the OCCA's ruling could also, at least arguably, be interpreted simply as a ruling on the merits.  The important point, however, is that, contrary to respondent's arguments, the OCCA's ruling cannot reasonably be interpreted as a procedural bar ruling.

Finally, respondent argues in his appellate response brief that "[t]he OCCA's waiver ruling was not based on [Bush's] failure to object to the admission of the victim impact evidence at trial," but instead "rested on the fact that [Bush] failed to raise the issue to the trial court in his motion to withdraw his plea."  Aple. Br. at 40.  That argument, however, is contrary to the record and thus meritless.  As noted, the OCCA stated only that "Bush failed to preserve any victim impact issues by objecting to the evidence when presented."  Bush I, 280 P.3d at 349.  Nowhere did the OCCA refer to Bush having failed to raise the issue in his motion to withdraw his guilty plea.

We therefore conclude, contrary to respondent's argument and contrary to the conclusion reached by the district court,[5] that this claim is not procedurally barred and, instead, is subject to review under § 2254(d).

    e) Analysis of the OCCA's decision

Whether the OCCA implicitly applied a plain error standard of review to the claim or instead reviewed the claim de novo, it reaffirmed its prior conclusion that Payne should be interpreted as allowing the admission of victim impact statements or evidence

---

[5] The district court denied the claim "as procedurally barred."  Dist. Ct. Docket No. 44 at 31.  In doing so, however, the district court did not engage in any analysis of the OCCA's decision, nor did it consider the plain error rule that is normally applied by the OCCA.

that include the witness's opinion of a recommended sentence.  Bush I, 280 P.3d at 349–

50.  That conclusion, however, was clearly contrary to the holding in Payne.

"This court has long disagreed with the OCCA" regarding the interpretation of

Payne and Booth and "ha[s] interpreted Booth and Payne to prohibit the prosecution from

presenting sentencing recommendations from family members of the victim."

Underwood v. Royal, 894 F.3d 1154, 1174 (10th Cir. 2018).  Significantly, in Bosse v.

Oklahoma, 137 S. Ct. 1 (2016) (per curiam), the Supreme Court effectively affirmed our

position and emphatically rejected the OCCA's position:

> The Oklahoma Court of Criminal Appeals has held that Payne
> 'implicitly overruled that portion of Booth regarding characterizations of
> the defendant and opinions of the sentence."  Conover v. State, 933 P.2d
> 904, 920 (1997) (emphasis added); see also Ledbetter v. State, 933 P.2d
> 880, 890–891 (Okla. Crim. App. 1997) . . . .
>
> "[I]t is this Court's prerogative alone to overrule one of its
> precedents."  United States v. Hatter, 532 U.S. 557, 567 (2001) (quoting
> State Oil Co. v. Khan, 522 U.S. 3, 20 (1997); internal quotation marks
> omitted); see Rodriguez de Quijas v. Shearson/American Express, Inc., 490
> U.S. 477, 484 (1989).  The Oklahoma Court of Criminal Appeals has
> recognized that Payne "specifically acknowledged its holding did not
> affect" Booth's prohibition on opinions about the crime, the defendant, and
> the appropriate punishment.  Ledbetter, 933 P.2d at 890–891.  That should
> have ended its inquiry into whether the Eighth Amendment bars such
> testimony; the court was wrong to go further and conclude that Payne
> implicitly overruled Booth in its entirety.  "Our decisions remain binding
> precedent until we see fit to reconsider them, regardless of whether
> subsequent cases have raised doubts about their continuing vitality."  Hohn
> v. United States, 524 U.S. 236, 252–253 (1998).
>
> The Oklahoma Court of Criminal Appeals remains bound by
> Booth's prohibition on characterizations and opinions from a victim's
> family members about the crime, the defendant, and the appropriate
> sentence unless this Court reconsiders that ban.  The state court erred in
> concluding otherwise.

137 S. Ct. at 2 (emphasis in original) (parallel citations omitted).  Since <u>Bosse</u> was issued, the State of Oklahoma has conceded that the admission of sentence recommendations by a victim's family members violates the Eighth Amendment. <u>Underwood</u>, 894 F.3d at 1173.  Thus, there is simply no doubt that the OCCA's rejection of Bush's challenge to the admission of victim impact testimony in his case was contrary to <u>Payne</u>.

Because the OCCA's decision was contrary to <u>Payne</u>, we afford it no deference and, instead, review the claim de novo.  <u>Id</u>.  More specifically, we must determine whether the Eighth Amendment violation that occurred as a result of the trial court's admission of improper victim impact testimony was harmless or whether, instead, it prejudiced Bush's defense at the sentencing proceeding.  "On habeas review, we ordinarily apply the <u>Brecht</u>[ v. Abrahamson, 507 U.S. 619, 638 (1993)] standard to determine whether constitutional error warrants relief from the challenged conviction or sentence."  <u>Id</u>. at 1175.  "Under this standard, constitutional error may be disregarded unless found to have 'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Id</u>. (quoting <u>Brecht</u>, 507 U.S. at 638).  "If a reviewing court is in grave doubt as to the harmlessness of an error, the habeas petitioner must win."  <u>Id</u>. (quotation marks omitted).  "In harmless error analysis in a capital case, we are mindful of the need for heightened reliability in determining a capital sentence."  <u>Id</u>. (quotation marks omitted).

In <u>Underwood</u>, we discussed the history of our "application of <u>Brecht</u> to the admission of unconstitutional sentence recommendations":

> This court has held that the admission of unconstitutional victim sentence recommendations required reversal under the <u>Brecht</u> standard in only one case: <u>Dodd v. Trammell</u>, 753 F.3d 971 (10th Cir. 2013). Before <u>Dodd</u>, "no prior panel of this court ha[d] ruled that victim recommendations of the death penalty required reversal." <u>Id.</u> at 997. The <u>Dodd</u> panel acknowledged ten previous decisions holding "that such testimony was harmless." <u>Id.</u> It cited three factors warranting a different result in that case: (1) "the sheer volume of [the unconstitutional] testimony," which included a "drumbeat" of seven death recommendations; (2) that the jury did not find the HAC aggravator or the continuing threat aggravator; and (3) that the defendant's guilt "was not as clear cut" as in previous decisions, due to the prosecution's sole reliance on circumstantial evidence. <u>Id.</u> at 997-98. Based on these factors, the panel found itself "in grave doubt about the effect of the error on the jury's sentencing decision" and held that "the admission of the sentence recommendations in this case was not harmless." <u>Id.</u> at 999 (citations and quotations omitted).

<u>Id.</u> at 1178–79 (footnotes omitted).

Applying these principles to the case at hand, we must, in order "[t]o determine whether" Harrington's family members' "statements had a substantial and injurious effect on the [judge's] sentencing decision," "consider them in the overall context of the trial and the 'record as a whole.'" <u>Id.</u> at 1179 (quoting <u>Brecht</u>, 507 U.S. at 638). Thus, we shall proceed to review in substantial detail the sentence recommendations made to the trial judge by the victim's family members, the evidence presented by the prosecution in support of the aggravating factors, the evidence presented by Bush in mitigation, and the trial judge's findings and sentencing decision.

### f) The sentence recommendations from the victim's family members

In terms of the sentence recommendations, this case is much closer to <u>Dodd</u>, the only Tenth Circuit case in which habeas relief has been granted on the basis of the admission of improper victim impact evidence, than it is to <u>Underwood</u>, where we

concluded that the admission of improper victim impact testimony was harmless.  In

Underwood, the victim's parents each gave very brief and "relatively pallid"

recommendations for the death sentence.  Id. at 1181.  In Dodd, in contrast, the

prosecution "went to the extraordinary length of eliciting [a death penalty]

recommendation from six, and perhaps seven, . . . witnesses."  753 F.3d at 997.  In other

words, the recommendations in Dodd were like "a drumbeat" rather than a "one-off or a

mere aside."  Id.  Much the same can be said in Bush's case.  As noted, the prosecution

elicited lengthy and emotional sentence recommendations, many of which were

accompanied by purported descriptions of the crime and the victim's suffering, from four

of the victim's close family members (his parents and siblings).  One of those

recommendations—from the victim's brother—included a request that the trial judge

allow him to personally punish Bush.  Another of those recommendations—from the

victim's father—attempted to persuade the trial judge that the victim's family effectively

joined him in his sentencing decision and also cited a Bible verse in an effort to persuade

the judge that Bush deserved the death penalty.  Lastly, the recommendation from

Harrington's mother referenced her own father's murder and the fact that his killer was

not punished.  In sum, the sentence recommendations were lengthy, egregious, and

potentially based on the inadmissible testimony from inmate Nash.

### g) The aggravating case

The prosecution presented testimony from twenty-three witnesses, including

Jackie Nash and the family members who gave victim impact statements.  The bulk of

that testimony was presented to support the alleged aggravating factors.

40

The first prosecution witness was Jimmy Barrington, who testified that Billy Harrington was his best friend.  Tr. at 1017.  Barrington described an incident on December 19, 2008, when Bush broke into Harrington's trailer by throwing a cinder block through a window.  According to Barrington, Harrington asked him to come over and help out with the situation.  Barrington testified that when he and Harrington entered the trailer, they observed a shotgun and a rifle leaning by the front door, and two rifles in the bedroom (one on the bed and the other leaning up against a wall).  Barrington testified that they called law enforcement and Harrington told the officers that he had attempted to take Bush to a rehabilitation facility earlier that morning, that the pair had gotten into a fight, and that Bush subsequently broke into Harrington's trailer. Barrington testified that the law enforcement officers refused to arrest Bush because he had previously stayed at Harrington's trailer with Harrington's permission.  Barrington further testified that later that same evening, Harrington asked him to help take Bush to a rehabilitation facility.  Barrington testified that after they dropped Bush off at the rehabilitation facility, he expressed his concern that Bush might harm Harrington. According to Barrington, Harrington responded that "he was not concerned that [Bush] would hurt him because he still believed that [Bush] trusted him."  Id. at 1045.  Lastly, Barrington denied that he and Harrington drank any alcohol on the evening that they took Bush to the rehabilitation facility.

The second prosecution witness was David Harrington, the victim's father.  He testified that at approximately 7:45 p.m. on December 22, 2008, someone using Billy's cell phone called their house and asked if "Stephanie" was there.  Id. at 1055.  He

41

testified that he subsequently realized that it was Bush who had made the call.  He further testified that shortly after the first call, his wife engaged in a series of calls with Bush. He testified that his wife kept asking Bush to speak with Billy, but Bush kept putting her off and saying that Billy couldn't talk then.

The third prosecution witness was Bobby Harrington, the victim's older brother. Bobby testified that at approximately 9:16 p.m. on December 22, 2008, he started calling Billy's cell phone.  He testified that at some point, he received a call back from Billy's cell phone and Bush was on the other end of the line.  According to Bobby, Bush said, "Bobby, this is Ronson what do you want?"  Id. at 1064.  Bobby testified that he responded by asking to speak to Billy.  Bush responded, "Well, Billy's not here" and then stated that Billy was "over helping me and my ex-wife [Stephanie Morgan] get back together."  Id.  Bobby testified that he asked Bush for Stephanie's address and phone number, and that Bush "kind of fumbled around" before providing him with an address he had never heard of before.  Id.  Bobby testified that he tried calling the phone number that Bush gave him, but no one answered.

The fourth prosecution witness was Dr. Inas Yacoub, the forensic pathologist who performed the autopsy on Billy Harrington's body.  Yacoub testified that the probable cause of death was "[m]ultiple gunshot wounds."  Id. at 1075.  Yacoub explained that she found six gunshot wounds.  The first was a wound "to the right back aspect" that "caused a fracture of the right 10th rib, laceration of the liver, diaphragm and right lung."  Id. at 1076.  Yacoub opined that "this wound was fatal by itself" due to "the bleeding associated with th[e] wound and because of the damage to the vital organs."  Id.  But,

42

Yacoub testified, the wound was not "instantaneously fatal." Id. at 1077.  Yacoub next

testified that she found three gunshot wounds "to the area of the right arm." Id.  Two of

those wounds, she testified, "caused fracture of the right humerus," and one "resulted in

bleeding and contusion of the right lung." Id. at 1077–78.  Yacoub testified that she also

found wounds "to the area of the left side of the neck" and "to the area of the left arm"

that "fractured the humerus." Id. at 1077.  Yacoub testified that one of the wounds to the

right arm, more specifically the one that caused damage to the right lung, appeared to be

a contact wound. Id. at 1078.  Yacoub testified that there was a brown paper bag around

Harrington's right foot, and that when she removed the bag, she observed a rope around

Harrington's right ankle. Id. at 1098.  Yacoub testified that she observed "plant matter

and pale brown abrasions on the inner aspect of the ankle on top of the [right] foot." Id.

Yacoub testified that Harrington "had blunt force trauma to the face" that was consistent

with his body being dragged with a rope. Id.  Yacoub testified that the dragging also

appeared to have caused a fracture of Harrington's left forearm. Id. at 1100–02.

According to Yacoub, she "requested an alcohol level . . . [a]nd it was negative." Id. at

1105. Yacoub also testified that there were no drugs in Harrington's system.  Yacoub

opined that each of the gunshot wounds would have caused pain and suffering to

Harrington, and that the gunshot wound that caused damage to the lung would have made

it uncomfortable for him to breathe.  Yacoub also testified that there was "a redness" to

the contusions on Harrington's face, and she opined that this indicated that his heart was

still pumping at the time he was dragged. Id. at 1111–12.  More specifically, she testified

it was her "opinion that the injuries that he sustained when he was being dragged on his

nose and his mouth and in his chin were not postmortem wounds." Id. at 1112.  In other words, she testified that she "did not feel that he was definitely dead when he sustained the injuries to his nose and mouth with the dragging." Id. at 1113.  Yacoub testified that she saw photographs from the crime scene showing "bloody footsteps coming out of [the] residence to the outside," indicating that "initially he was able to walk with some of the gunshot wounds." Id.

The fourth prosecution witness was Kathy Harrington, the victim's mother.  She described being present at the victim's trailer on the evening of December 19, 2008, shortly after Bush broke into it.  She testified that she observed two long guns in the living room by the front door, and that Barrington took those guns back to the bedroom to put them away.  She further testified that her son did not normally keep his guns in the living room.  Mrs. Harrington next testified about the events of December 22, 2008 (the day Billy was murdered).  She testified that she spoke by phone with Bush at approximately 3:59 p.m. that afternoon.  She testified that Bush had just left a mental health facility and was with her son.  Bush told her "he was doing good, he was clean, and he had everything out of his system and they had released him." Id. at 1146.  Bush then passed the phone to Harrington and Mrs. Harrington spoke with him for the last time.  Mrs. Harrington testified that she attempted to call her son later that evening, but Bush answered and said that Harrington was in the shower.  Mrs. Harrington kept trying to reach her son, but without success. She testified that the last time she spoke with Bush was at approximately 8:52 p.m. and that they had a nineteen-minute conversation.  During that conversation, Mrs. Harrington asked Bush if "there [had] been a shooting,"

and stated that she needed to speak with her son. Id. at 1155. She then asked Bush where her son was. Id. Bush responded that Harrington "was about 50 feet from him." Id. She "told [Bush] to get out of the pickup and walk to [Harrington] and give him the phone." Id. According to Mrs. Harrington, Bush "got out of the pickup" and "walked a distance without saying anything." Id. "[W]hen he got to [Harrington] he said, [Harrington] couldn't talk." Id. Mrs. Harrington testified that during the nineteen-minute conversation she did not get the impression that Bush was intoxicated, but he "had a sad voice" and seemed "like . . . he might have been sorry for something." Id. at 1157.

The fifth prosecution witness was Preston Wallace, an officer with the Oklahoma City Police Department. Wallace testified that he grew up with Billy Harrington and, on December 22, 2008, received a call from Harrington's mother asking if he could go check on him. Wallace testified that when he arrived at Harrington's trailer at approximately 10:30 p.m., he was met by some sheriff's deputies and they approached the front door of the trailer. No one answered the door, but Wallace "peeked in the window of the door and . . . could see what [he] believed or thought was blood on the front entryway and a shotgun laying in the floor." Id. at 1175. The front door was locked, so one of the deputies kicked it in. Wallace testified that when they entered the house he observed "[m]ore of what [he] believe[d] to be blood throughout the house." Id. at 1176. He observed two guns propped up in the corner of the bedroom, one laying on the floor, and the shotgun that was laying on the floor by the front door. Wallace and a deputy left the trailer and walked towards a shop building "to see if there was anybody inside the shop." Id. at 1178. As they were walking to the shop, Wallace saw "a dark puddle on the

45

ground" that "could either be blood or motor oil from a leaking vehicle." Id.  Wallace

also saw "more of that same substance" leading away from the dark spot on the ground.

Id.  Wallace testified that they found Harrington's body lying beside a vehicle on the

backside of the property.  Wallace testified that he observed a rope wrapped around

Harrington's right leg.  Wallace testified that he returned to the trailer and observed what

appeared "to be bloody footprints" on the front porch.  Id. at 1181.

The sixth prosecution witness was Delwin Haney, an inmate at the Grady County

(Oklahoma) Jail.  On February 24, 2009, Haney gave a statement to Sheriff's Deputy

Robert Jolly regarding an incident that occurred in Haney's cell.  At that time, Bush and

two other inmates were also confined in Haney's cell.  Haney reported that Bush and the

other two inmates were attempting to escape by taking the window off.  Haney

specifically told Jolly that Bush had been using a six-inch piece of metal taken from the

drain to "chip[] out the window trying to get out." Id. at 1196.

The seventh prosecution witness was Canon Luney, who also was confined in the

Grady County Jail in February of 2009.  Luney testified that he was assigned to a cell

with Bush, Haney, and two other inmates.  Luney denied that he and Bush tried to escape

from the cell, but he admitted that they could be seen on a surveillance video alternating

turns at the cell window.  Luney testified that Bush told him he had killed his best friend.

The eighth prosecution witness was Robert Jolly, who in February 2009 was

employed as a deputy with the Grady County Sheriff's Office.  Jolly testified that he was

asked to investigate an attempted escape from the Grady County Jail.  Jolly testified that

he interviewed inmates Delwin Haney and Noe Calderon, and that their accounts were

consistent with each other.  According to Jolly, the jail had a surveillance video showing Bush and Luney going back and forth to the window of the cell and making prying motions.  Jolly testified that, during the course of his investigation, he found an 8.5 inch piece of metal hidden in the drain of the cell's floor.

Karrie Springstead, an employee with Oklahoma's Probation and Parole Office, was the prosecution's ninth witness.  She testified that in December 2008, she served as Bush's parole case manager and received information from Bush's girlfriend that he was back on drugs.  In response to that information, she reactivated his file on December 16, 2008, and began supervision again.  On December 18, 2008, she made personal contact with Bush and he admitted that he was using methamphetamine and drinking alcohol.

Elizabeth Green, an agent with the Oklahoma State Bureau of Investigation (OSBI), was the prosecution's tenth witness.  Green testified that on December 22, 2008, she was called to investigate the crime scene at issue in this case.  She testified in detail about what she found at the crime scene, including the state of Billy Harrington's body.  For example, she testified that she observed "grooves in the dirt that lead up to . . . Harrington's right hand [that were] consistent with fingers being drug through the dirt."  Id. at 1267.  She also testified, for example, that there was a Winchester 12 gauge shotgun laying on the living room floor near the entryway.

The prosecution's twelfth witness was OSBI agent Lydia Williams.  She testified that she collected samples of what appeared to be blood from the front bumper of Harrington's truck.  Inside of Harrington's truck, she found a receipt from a local convenience store indicating that someone had purchased beer at 9:02 p.m.  Williams

testified that this was significant because they believed that Harrington died prior to 9:02 p.m.

Lois Garrison, an investigator employed by the "District Six District Attorney's Office," was the prosecution's thirteenth witness. Id. at 1324. Garrison testified that he was asked "to go investigate at Step-N-Fetch grocery to retrieve some video of . . . Bush coming in, buying some beer, [and] using a credit card" belonging to Harrington. Id. Garrison testified that he completed this task and made a video copy of the segment of the surveillance video showing Bush making the purchase. That video, with Garrison commenting, was played for the trial court. In particular, Garrison testified that he verified that Bush used Harrington's credit card to make the purchase.

The prosecution's fourteenth witness was Gary Bazemore, a detention officer with the Grady County Jail. Bazemore testified that on May 5, 2009, he performed a random search of Bush's cell after Bush left the cell to go to an interview room to meet with his attorney. Bazemore testified that, during the course of the search, he found a shank approximately twelve inches in length. The shank, he testified, "was stuck in a grate or a vent over the plumbing chase right next to the sink." Id. at 1334. Lastly, Bazemore testified that Bush was the only inmate assigned to the cell at the time of the search.

Kent Baldwyn, an information technology manager for the Grady County Jail, appeared as the prosecution's fifteenth witness. He testified that on February 19, 2009, he had entered Cell 136 to fix a light. According to Baldwyn, Bush and at least two other inmates were assigned to Cell 136 at that time. While he was working on the light, Baldwyn observed that the window screen "had been pried from the bottom left out" and

48

"[i]t was out away from the wall about an inch . . . ." Id. at 1338–39.  Baldwyn testified

that "whoever had done that had put toilet paper and tooth paste on it to try to hide it."

Id. at 1339.  Baldwyn believed that the inmates assigned to the cell had attempted to pry

open the window screen in an attempt to escape.  Baldwyn testified that he looked in the

drain on the floor of the cell and determined that the inmates "had taken a metal rod out

of the drain" and that "one end of" the rod was "pointed, sharp and [that was] the object

they were using to pry [the window] out." Id. at 1340.  Baldwyn testified that he looked

in the cell for the rod but could not find it.  Baldwyn testified that he searched the cell

again the next morning and found the rod hidden down in the drain on the floor.  He

testified that he then viewed surveillance videos of the cell and observed Bush and inmate

Luney taking turns working at the window.  Lastly, Baldwyn testified that he had been

involved in a previous incident involving Bush's cell.  According to Baldwyn, he

discovered that someone had kicked the window "pretty hard" and had loosened the

towel bar to the point that "anybody could just [have] taken [it] right off." Id. at 1347–

48.

     Shane Wyatt, the jail administrator for the Grady County Jail, was the

prosecution's sixteenth witness.  He testified that he was asked to monitor Bush's mail

and make a copy of every letter that Bush sent or received.  Before talking about any

specific letters, Wyatt testified about an incident report in which his officers reported that

Bush was trying to tear a towel bar off the wall of his cell and had admitted to doing so.

Wyatt then testified about a letter in which Bush "was trying to apologize" to prison

officials "for trying to tear up the bar" so that he could get out of "a max facility

holding." Id. at 1353.  He in turn testified about a letter written by Bush to another inmate attempting to persuade that other inmate to bring tobacco and snuff, which were prohibited items, into the jail.

Stephanie Morgan, Bush's ex-girlfriend, was the prosecution's seventeenth witness.  Morgan testified that while Bush lived with her he stole her credit card and used it to make $2,500 in charges.  When she confronted Bush about it, he initially denied stealing and using the card, but later admitted that he had done so.  She determined that Bush had used her card at gas stations, a pawnshop, a liquor store, and on the Dish Network to "charge[] a bunch of porn." Id. at 1365–67.  Morgan also testified that Bush, while in jail, repeatedly violated the protective order she had obtained against him by sending her approximately seventeen letters and giving her phone number to other inmates.  In some of the letters Bush sent her, he admitted killing Harrington.  Morgan testified that Bush stated in his letters that he had asked Harrington if he and Morgan had slept together, that Harrington "admitted to it," and that Bush shot him in response. Id. at 1370.  According to Morgan, Bush blamed Morgan for causing him to kill Harrington.  Morgan testified that Bush, in his letters, also accused her of sleeping with many other people.  Lastly, Morgan testified that Bush told her he would kill her if he ever saw her dating anyone but him.

The prosecution's eighteenth witness was Art Kell, the sheriff of Grady County, Oklahoma.  Kell testified that he had known Bush since Bush was born.  Kell in turn testified that he interviewed Bush on December 23, 2008, and again on January 4, 2009.  Kell testified that, during the January 4th interview, Bush admitted stealing guns from his

family and selling them to drug dealers prior to Harrington's murder.  According to Kell, Bush stated that he received one gram of methamphetamine for each weapon.

The prosecution's nineteenth through twenty-third witnesses were all relatives of Billy Harrington who provided victim impact statements.  Their testimony was described in detail above.

### h) The mitigating case

Bush's case in mitigation included testimony from sixteen witnesses.  The first witness, Jayleen Fowler, identified herself as Billy Harrington's girlfriend.  She testified that at approximately 7:14 p.m. on December 22, 2008, she spoke by telephone with Harrington and could hear Bush talking in the background.  She testified that Bush did not sound drunk and that he was teasing Harrington by saying, "I miss you, Jayleen, I love you, I miss you."  Id. at 1451.

The second mitigation witness was Ralph Anderson, an employee of the Oklahoma Department of Corrections (ODC).  Anderson testified that he was in charge of training and caring for dogs used by the ODC for tracking and apprehending escapees.  Anderson further testified that in 2002–03, Bush was an inmate-employee who assisted him in caring for the dogs.  Anderson described Bush as "a good worker" who "took pride in it."  Id. at 1455, 1457.

The third mitigation witness was Bush's uncle, Mark Henderson.  Henderson testified that he owned a business that delivered hay to dairies and ranches in a multi-state area.  Henderson testified that Bush worked for him from the fall of 2007 until approximately August of 2008.  According to Henderson, Bush was a "[g]ood worker . . .

[a]nd the customers got along with him real well." Id. at 1468.  Henderson testified that

prior to quitting, Bush began exhibiting signs of tardiness and other issues, and

Henderson began hearing rumors that Bush had drinking and drug problems.  Henderson

also testified that Bush stole items from his barn and was convicted for that crime.

Henderson testified that Bush's life had value to him and that he loved Bush.[6]

Kristen Pickle, Bush's ex-wife, was the fourth mitigation witness.  She testified

that Bush's drinking caused their relationship to fail.  She also testified that Bush, while

in prison, maintained regular contact with their minor son.  Lastly, she testified that it

would be important for her son and Bush to continue their relationship.[7]

The fifth mitigation witness was Bush's stepfather, Douglas Black.  Black, who

worked as a sheriff's deputy, testified that he arrested Bush for failure to comply with the

terms and conditions of his parole and, at the time he did so, "was hoping [they] could get

[Bush] some help for his drug and alcohol addiction." Id. at 1489.  Black further testified

that, at some point prior to this arrest, Bush had stolen some guns from him.  Black

---

[6] On cross-examination, Henderson agreed with the prosecutor that Bush "ha[d] a
long, long history of manipulating different people, with his family, with his friends,
[and] everything revolved around . . . Bush." Tr. at 1475.  Henderson also agreed that
Bush "made his own choices to go down the wrong road." Id.

[7] On cross-examination, Pickle conceded that Bush threw things and knocked
holes in walls and windows when they were married, and that, because of his behavior,
she was scared of him.  She also conceded that Bush was an absentee father until he was
in prison. Lastly, and most significantly, Pickle conceded that if she took her son out of
the equation, she believed that Bush deserved the death penalty for what he did.

testified that he loved Bush and believed that Bush's problems were caused by drug and alcohol addiction.[8]

Michael Hankins, an inmate at the John Lilley Correctional Center in Bolley, Oklahoma, was the sixth mitigation witness.  Id. at 1503.  Hankins testified that he and Bush grew up in the same town and that, for a time, Hankins' sister was married to Bush's father.  Id. at 1504.  Hankins testified that it was difficult for Bush when Bush's parents divorced.  Id. at 1506.  Hankins testified that, as adults, he and Bush were confined together in the same correctional facility.  Id. at 1507.  Hankins testified that he never saw Bush "hanging around the wrong crowd" in prison and, instead, Bush had a job and played softball and basketball.  Id. at 1507–08.  Hankins opined that Bush would "be all right" in a structured prison setting.  Id. at 1508.

The seventh mitigation witness was Billy Kemp, the owner of a diesel shop in Chickasha, Oklahoma.  Kemp testified that he first met Bush when Bush was in his early 20's, and that soon thereafter Bush began working at his shop doing maintenance and driving an equipment delivery truck.  Kemp testified that he was aware that Bush had a drinking and drug problem.  Kemp was asked about his contacts with Bush during

---

[8] On cross-examination, Black testified that Bush's drug problems began in approximately 2002.  Black agreed that Bush had the support of friends and family and that "there was no reason why [he] couldn't be a peaceful law abiding citizen." Tr. at 1493.  Black testified that it was common for Bush to lie and manipulate people.  Black also testified that Bush stole three guns from him while on parole.  When asked if he considered Bush to be a threat to people, Black responded: "If he's off the drugs and alcohol, no."  Id. at 1498.  Finally, Black testified that it was "not [his] decision" what sentence Bush should receive, but he conceded that Bush had received more chances to straighten up than most people receive in a lifetime and that he had "chosen the wrong path everytime."  Id. at 1500.

December of 2008.  Kemp testified that Bush would stop by the shop two or three times a week and was usually drunk, regardless of the time of day.  According to Kemp, when Bush was not drinking, he was one of the most dedicated and hardest-working employees that Kemp ever had.

The eighth mitigation witness was Brenda Hankins Watson, who married Bush's father following the divorce of Bush's parents.  Watson testified that Bush came to live with them when he was approximately thirteen or fourteen years old.  She testified that she was devastated and heartbroken over Bush's situation.  She also testified that Bush's life had value to her and that she would resume contact with him if he was given a life sentence.

Jimmie Lea Black, Bush's half-sister, was the ninth mitigation witness.  Black testified that Bush's drug and alcohol problems became an issue approximately a year after he was released from prison.  She testified that he began drinking more and his behavior became more erratic.  She testified Bush "was a violent person sometimes when he was intoxicated."  Id. at 1535.  She also testified that Bush became paranoid and thought "people were after him or that . . . people were following him and he always thought that [his girlfriend] Stephanie was cheating on him."  Id.  She suspected he was using methamphetamine or cocaine because at one point she observed that "his nose was bleeding."  Id. at 1536.  Black testified that, shortly prior to the murder, she and her family were trying to get Bush placed into rehabilitation.  According to Black, she was angry with Bush about killing Harrington, but still loved him and intended to maintain contact with him in prison.

The tenth mitigation witness was Bush's father, Ronnie Bush.  He testified that Bush was approximately three or four years old when he and his wife divorced.  Ronnie Bush testified that Bush began living with him and his new wife, Brenda Hankins Watson, at some point when Bush was in middle school.  He testified that Bush was involved in Future Farmers of America, played basketball and baseball, and worked on Ronnie Bush's farm.  Ronnie Bush testified that Bush changed during his senior year of high school and was a "bully."  Id. at 1558.  He also testified about two accidents that Bush had: one involving a four-wheeler while Bush was in high school, and another involving a semi-truck after Bush had graduated from high school.  Ronnie Bush testified that Bush "act[ed] mentally different" after the semi-truck accident.  Id. at 1562.  Ronnie Bush testified that Bush began drinking and using drugs and eventually went to prison for, in part, stealing checks from him.  Ronnie Bush discussed an incident that occurred in October of 2008 when Bush was acting "weird" and "crazy" and was fearful that a group of "Mexicans" were after him.  Id. at 1568–69.  Ronnie Bush noted that Harrington agreed to let Bush stay with him after this incident.  Ronnie Bush testified that, in the days following this incident, he and other family members of Bush were planning how to get Bush into a counseling facility.  Bush also described another incident that occurred in December 2008 when Bush was arrested for not paying costs and fines.  Ronnie Bush testified that he loved Bush, but was angry at him for what he had done to Harrington. He testified that it "wasn't [Bush] that did that" because Bush "was on drugs, alcohol, [and] he should never [have] been" released from the rehabilitation facility.  Id. at 1576. He testified that Bush, when "off of drugs and alcohol," was "a hard worker" and "a real

nice person." Id.  Lastly, he testified that he would like Bush to receive a sentence less than death.[9]

Rhonda Tharp, Bush's aunt, was the eleventh mitigation witness. Id. at 1587.  She briefly described Bush's childhood and testified that Bush "ha[d] a knack for older people and babies" and was "a very loving person." Id. at 1589.  Tharp in turn described an incident in 1996 when Bush was competing at a rodeo and was thrown off of a horse and sustained a head injury. Id. at 1590.  When asked how she felt about Bush, she responded: "I feel he's a very good person when he is not on alcohol and drugs.  He's a very loving person.  He is my nephew.  We're all suffering with what he's done.  But I will not stop loving him and I will continue to see him." Id. at 1593.

The twelfth mitigation witness was Eric Thornburg, an individual who performed "jail[]ministry" in Grady County, Oklahoma, "every Friday of . . . each week." Id. at 1615.  He testified that he first met Bush in June of 2009.  He was concerned that Bush was suicidal.  Thornburg testified that he and Bush subsequently exchanged a few letters and that he met one-on-one with Bush.  During their one-on-one meeting, Thornburg testified, Bush cried the whole time and expressed remorse and sympathy for Harrington's family.

The thirteenth mitigation witness was Ken Sue Doerful, an attorney who was retained by Bush's family to represent Bush in an earlier parole matter.  Doerful testified

---

[9] On cross-examination, Ronnie Bush admitted that Bush stole checks from him and his parents, and also urinated on his parents' couch after breaking into their house to steal their checks.

that she was successful in getting Bush paroled, and that she and Bush remained friends thereafter.  Doerful further testified that Bush called her on December 18, 2008, and "[h]e was very, very messed up."  Id. at 1636.  She told Bush at that time they "needed to try and get him into a long term rehab" and asked if she should "call his mother."  Id.  Doerful testified that "at the end of the conversation [Bush] indicated he was going to try and get up to Griffin Hospital in Norman."  Id.  Bush said "he didn't want to live anymore" and "that he knew he had really, really messed up and disappointed a lot of people."  Id. at 1637.

The fourteenth mitigation witness was Bush's mother, Tina Black.  She testified that she and Bush's father, Ronnie Bush, divorced when Bush was four years old.  She testified that Bush lived with her until age twelve, when he began living with his father.  According to Black, Bush moved back to Chickasha after high school and began driving a hay truck for her and her husband.  Black testified that Bush was a good worker and an excellent auctioneer.  Black testified that Bush married a woman named Kristen Jones and that they had a son named Brennon.  Black acknowledged that Bush eventually started drinking, got into trouble for stealing items from various family members, lost his job, and eventually went to prison.  According to Black, Bush was released from prison on September 22, 2007.  Black testified that Bush had a loving relationship with his son Brennon.  Black testified that Bush began living with his girlfriend, Stephanie Morgan, in June or July of 2008.  Black described an incident in December of 2008, prior to Harrington's murder, when Stephanie Morgan was at Black's house and Morgan got into an argument with Bush on the phone.  According to Black, Bush "was pretty vocal that

day and kind of out of control" and he "[w]ouldn't listen" to Morgan. Id. at 1651.  She

testified that she "didn't want him . . . hurting" Morgan "till he got straightened up." Id.

Black testified that shortly after this incident, Morgan sought and received a restraining

order against Bush.  Black also testified that, shortly after this incident, she noticed that

guns and jewelry were missing from her house.  She testified that Bush was subsequently

arrested by some deputies on a warrant for failure to pay his fines.  Black, who worked

for the local county court clerk's office, testified that Harrington came into her office and

wanted to bail Bush out of jail.  Black testified that Bush had been friends with

Harrington for years and could always call Harrington if he needed something.  Black

testified that she became angry with Billy upon learning that he intended to bail Bush out

of jail.  Lastly, Black testified that she would always love Bush.[10]

The fifteenth mitigation witness was licensed psychologist Dr. Gayle Poyner.

Poyner testified that she was hired by Bush's defense attorneys "to do a psychological

evaluation" of Bush, to "evaluate his psychological history, review [his] records . . . and

research the effects of the medication [he] was taking at the time of the crime." Id. at

1682.  Asked to summarize Bush's mental health history, Poyner testified that, based

upon reports from his family members, Bush "began having certain problems in his youth

with respect to fighting," particularly "[i]n the 12th grade," and "later the family

consistently describe[d] him as, 'flipping out, crazy, paranoid, being not all there.'" Id. at

1683.  As for her clinical interview of Bush, Poyner testified that Bush "reported to [her]

---

[10] On cross-examination, Black conceded that Bush wrote a letter to her saying that
he deserved the death penalty for what he had done.

58

that he ha[d] . . . problems associated with anxiety such as an inability to sleep, . . . racing thoughts, feeling nervous, and interestingly his brain feeling itchy." Id. at 1683–84. Bush also reported that he "had trouble with depression off and on for several years" and "ha[d] serious problems with respect to drugs and alcohol." Id. at 1684.  Poyner opined that Bush suffered from bipolar disorder, but was never properly diagnosed.  Poyner testified that, in terms of medications to treat his psychological conditions, Bush "took Zoloft and Paxil, Celexa, Buspar, and Trazodone." Id. at 1685.  When asked why Bush had never before been diagnosed with bipolar disorder, Poyner testified that "the average span of time between when somebody starts showing symptoms and when they're correctly diagnosed is about eight years." Id. at 1686.  She also explained that "people with bipolar [disorder] very often use drugs or alcohol to try and slow that racing down" and "when they start taking drugs and alcohol and then subsequently become addicted to them the focus moves over to the drugs and alcohol and very typically the bipolar is missed." Id. at 1686–87.  Poyner testified that people with untreated bipolar disorder typically "have relationship problems, financial problems, legal problems" and "[t]end to be more risk takers." Id. at 1695.  In Poyner's view, Bush's "involvement with crime" was "highly correlated with his mental illness." Id. at 1699.  Poyner also testified that the records she reviewed indicated that Bush "was seriously mentally ill" and "needed treatment" in the days leading up to the murder. Id. at 1701.  Poyner noted that Bush was voluntarily admitted to a treatment facility shortly prior to the murder, and she opined that the treatment Bush received there was lacking.  Poyner noted that the psychiatrist who saw Bush diagnosed him with depression and prescribed the antidepressant Celexa.

Poyner noted that Bush checked himself out of the facility two days after arriving and "began drinking heavily and went to[]Harrington's house." Id. at 1709.  Poyner opined that the treatment facility "was appalling[ly] negligent in how they treated or did not treat . . . Bush" because "[t]hey failed to follow their own policies and procedures," "gave him no treatment," and "then discharged [him] in an unstable state after which he killed" Harrington. Id. at 1742–43.  Lastly, Poyner opined that the antidepressants that had been repeatedly prescribed to Bush "activated his brain" and caused him to "bec[o]me very violent." Id. at 1727.  Poyner further opined that it was inappropriate to prescribe antidepressants to someone suffering from bipolar disorder and that the drugs caused Bush to become aggressive, angry and violent.[11]

The sixteenth and final mitigation witness was Dr. David Musick, a sociology professor at the University of Northern Colorado.  Musick testified that he was hired by defense counsel to review "case materials," including medical records, school records, discovery documents, court records, and prison records. Id. at 1798–99.  Musick essentially summarized Bush's background from childhood until the time of the murder. In particular, Musick testified about Bush's heavy alcohol use and his use of methamphetamine.

---

[11] The prosecution presented a rebuttal witness, psychologist Dr. Terese Hall, who opined that Dr. Poyner "probably overstated the potential effects of [the antidepressant] Celexa." Tr. at 1841.  Hall explained that "while there maybe [sic] a very small percentage of people who experience irritability and even aggression on" Celexa, "there are no clinical trials or double-blind studies that establish homicide as a result," and thus Poyner overstated the causal connection between Bush's use of Celexa and the murder. Id.

*i) The trial judge's decision*

The trial judge announced his sentencing decision in open court on the afternoon following the conclusion of the second-stage evidence (October 29, 2009). Before addressing his findings regarding aggravating circumstances, the trial judge stated:

> I wish that today the book would be closed for the Harrington family. It won't be. Today only ends one chapter in a saga that will continue for many years.
>
> However, I hope that some confidence has been regained in the legal system, a system where competent prosecutors and defense attorneys present their cases to the best of their ability, but there is only one just result.

Tr. at 1875 (emphasis added).

After making this statement, the trial judge proceeded to find "that the State of Oklahoma ha[d] met its burden [regarding] the heinous, atrocious and cruel aggravator." Id. at 1876. Specifically, the trial judge stated: (a) "[t]he evidence is unclear, but I make the findings that shots were fired both inside and outside of the house"; (b) "the defendant tied a rope to [Harrington's] foot and dragged him behind a vehicle in a heinous and atrocious manner with extreme cruelty"; and (c) Harrington's "death was proceeded [sic] by great pain due to the bullet wounds through his back, both upper arms shattering the bones of those, and was the result of serious physical abuse." Id.

The trial judge in turn "f[ou]nd that the State . . . met its burden that the defendant w[ould] commit future acts of violence that constitute[d] a continuing threat to society." Id. at 1879. In support of that finding, the trial judge stated:

> During his incarceration and pending trial the defendant has attempted and/or conspired to escape from the Grady County Jail.

61

Also in his cell was found what was fashioned as a shank, which is a weapon that was confiscated by his – from his jail cell by detention officers.

The defendant has also repeatedly violated a valid protective order that was issued by the District Court of Grady County by continuing to call, communicate with, and send letters to the victim of that protective order, Stephanie Morgan.

That on the night of December 22, 2008, the defendant did forcibly enter her home and lay in wait for the petitioner, Stephanie Morgan, in violation of said protective order.

Multiple protective order violations have occurred both before and after the defendant's incarceration on this case.

The defendant has also committed numerous uncharged property crimes against Stephanie Morgan such as the use of her credit card.

The defendant has exhibited extreme callousness during the commission of his crime.  The shear [sic] brutal nature of this murder exhibits a tendency of the defendant to commit violent crimes and demonstrates his continuing threat to society.

By shooting him six times and dragging his body into a pasture in an attempt to conceal the crime, then he took without permission Billy Harrington's vehicle to a convenient [sic] store in Anadarko, Oklahoma where he purchased beer using the victim's credit card.

Afterwards he drove Mr. Harrington's vehicle to the home of Stephanie Morgan where he forcibly entered the home and lay in wait for her return.

He has victimized his own family by stealing guns from his mother and stepfather Doug and Tina Black in the weeks prior to the homicide.

He's continued to use and abuse drugs and alcohol.

As was brought out in the trial, he broke into the home of the victim Billy Harrington within the week prior to the murder.  He obtained the victim's guns and placed them throughout his house.

All of this shows that there is a pattern of escalating criminal activity
and general disregard for the rules of society.

Id. at 1877–79.

The trial judge also found "that the State of Oklahoma ha[d] met its burden that
the defendant was serving a sentence of imprisonment for conviction of a felony when
the murder was committed."  Id. at 1879.

The trial judge did not make any findings regarding "the mitigating factors
presented by defense counsel" and instead simply stated that he had "considered" those
factors.  Id. at 1880.  The trial judge in turn stated that he "f[ou]nd that the aggravating
circumstances outweigh[ed] the mitigating circumstances."  Id.  Consequently, he
sentenced Bush to death on "Count One of the information, murder in the first degree."
Id.  He also sentenced Bush to life imprisonment on "Count Two of the information,
possession of a firearm after former felony conviction."  Id.

On the same day that the trial judge announced his sentence in open court—
October 29, 2009—he also filed a written document entitled "DECISION OF THE
COURT AS TO THE SENTENCING STAGE."  Aplt. Br., App. A at 1.  The decision
summarized the trial judge's findings of the aggravating factors, his finding that the
aggravating factors outweighed the mitigating circumstances, and his decision to fix
Bush's punishment at death for the murder conviction.  Id. at 1–2.  The last line of the
decision stated: "IT IS SO ORDERED!"  Id. at 2.

63

Little more than a month later—on December 3, 2009—the trial judge filed a written order overruling Bush's motion to withdraw his plea of guilty.  Id., App. B at 1. That order also included the same final order language: "IT IS SO ORDERED!"  Id.

*j) Conclusion*

Considering all of the above-described circumstances, it is concededly a close question whether the victim impact statements had a substantial and injurious effect on the trial judge's sentencing decision.  As noted, the victim impact statements were numerous, emotional, and in at least one instance, egregious, and in that sense this case is similar to Dodd.  More specifically, as in Dodd, the prosecution's "presentation of victim requests for the death penalty was not a one–off or a mere aside," but rather "a drumbeat."  753 F.3d at 997.  In addition, and unlike in Dodd, the statements made by the trial judge in announcing the sentence, and his use of exclamation points in the two orders he issued, are troubling and suggest that the judge may, to some extent, have been responding to the family members' requests for imposition of a sentence of death.

On the other hand, and in stark contrast to Dodd, this was not a "weak[] case for the death penalty," either in terms of Bush's guilt or in terms of the aggravating factors found by the trial judge.  Id. at 998.  In Dodd, "the guilt of [the] Defendant was not . . . clear cut" and was based exclusively on "circumstantial" evidence.  Id.  More specifically, Dodd "was a circumstantial case" because "[t]here was no confession, no eyewitness; and no physical evidence" that "marked Defendant as the culprit."  Id.  Here, in contrast, Bush's responsibility for the murder was undisputed.  Indeed, Bush repeatedly confessed to the murder.

64

Further, in <u>Dodd</u>, "the jury did not find the aggravating circumstance that the murder was 'especially heinous, atrocious, or cruel.'" <u>Id.</u>  In contrast, the trial judge in this case found the existence of three aggravating factors: the murder of Harrington was "especially heinous, atrocious, or cruel"; Bush was a continuing threat to society; and Bush was serving a sentence of imprisonment for a felony conviction at the time the murder was committed.  Notably, Bush does not challenge any of these findings and, indeed, the evidence presented at the sentencing proceeding in support of each aggravator was substantial and compelling.

With respect to the HAC aggravator, the evidence established that Bush shot Harrington inside of Harrington's trailer with a .357 caliber revolver, that Harrington stood up and walked first to the kitchen and then outside of the trailer to the front yard, and that Bush followed him and continued shooting him.  The forensic pathologist who testified at trial opined that Harrington sustained six gunshot wounds, including (1) a wound to the right back that caused a fracture of Harrington's right tenth rib, as well as laceration of his liver, diaphragm, and right lung; (2) three wounds to Harrington's right arm, two of which fractured his right humerus, and one of which was a contact wound; (3) a wound to the left side of Harrington's neck; and (4) a wound to Harrington's left arm that resulted in the fracture of his left humerus.  The pathologist also testified that each of these gunshot wounds would have caused pain and suffering to Harrington, and that the gunshot wound that damaged his lung would have made it uncomfortable for him to breathe.

65

As for the continuing threat aggravator, the evidence established that Bush, after shooting Harrington six times, proceeded to tie a rope to Harrington's leg and, using Harrington's truck, dragged Harrington to a separate part of Harrington's property. The evidence further established that Bush had a long history of drug and alcohol abuse and a corresponding history of criminal behavior that included stealing from family members and friends. The evidence also established that Bush had, during his period of post-murder confinement, attempted to escape from custody, possessed a shank, and also attempted to remove a towel bar in his cell, presumably for use as a weapon.

Finally, with respect to the third and final aggravator, it is undisputed that, at the time Bush committed the murder, "he was on Parole from the Oklahoma Department of Corrections in Grady County [(Oklahoma)] Case Number CRF-2001-314 for eight (8) Felony counts of Uttering a Forged Instrument and one (1) Felony count of Possession of Stolen Property." State ROA, Vol. I at 40 (bill of particulars).

Ultimately, given the circumstances of the murder, the presence of the aggravating factors, and the substantial evidence presented in support of those aggravating factors, we conclude that the trial judge would have imposed the same sentence—death—in the absence of the victim impact statements. Thus, we conclude that the erroneous admission of the sentence recommendations from the victim's family members did not have a substantial and injurious effect or influence on the trial judge's sentencing decision. Consequently, we conclude that Bush is not entitled to federal habeas relief on the basis of this claim.

*Issue Three – ineffective assistance of trial counsel – failure to object to*
*victim impact testimony*

In his third issue on appeal, Bush argues that if his trial attorneys "fail[ed] to
preserve" his "victim impact challenge for federal habeas review," "then that was a
violation of [his] Sixth Amendment right to the effective assistance of [trial] counsel."
Aplt. Br. at 74.  For the reasons outlined above in the discussion of Issue Two, it appears
that the OCCA proceeded to resolve the victim impact challenge on the merits (perhaps
under a plain error standard), and thus there is no need for us to reach Issue Three.  We
will, however, out of an abundance of caution, proceed to review Issue Three on the
merits.

*a) Clearly established federal law applicable to the claim*

The clearly established federal law applicable to this claim is the familiar two-part
test outlined in Strickland v. Washington, 466 U.S. 668, 687 (1984).  Under the first part
of this test, a "defendant must show that counsel's performance was deficient."  Id. at
687.  "In light of the variety of circumstances faced by defense counsel and the range of
legitimate decisions regarding how best to represent a criminal defendant, the
performance inquiry necessarily turns on whether counsel's assistance was reasonable
considering all the circumstances."  Wong v. Belmontes, 558 U.S. 15, 17 (2009) (per
curiam) (internal quotation marks and brackets omitted).

Under the second part of the test, a "defendant must show that the deficient
performance prejudiced the defense."  Strickland, 466 U.S. at 687.  "This requires
showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a

67

trial whose result is reliable." Id.  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

*b) Presentation of the claim to the OCCA*

Bush raised this issue in his direct appeal brief.  Direct Appeal Br. at 77–78 ("Failure to object to patently inadmissible victim impact evidence.").  The OCCA rejected the claim on the merits:

> Next, Appellant claims that counsel was ineffective for failing to object to victim impact evidence.  In the discussion regarding victim impact evidence, it was noted that the presumption is that the trial court only relied on admissible evidence.  An objection by counsel would not have made a difference in this case, because Bush cannot overcome the presumption that the trial court did not rely on objectionable material.

Bush I, 280 P.3d at 351.

*c) Analysis*

Although the OCCA did not directly say so, it effectively resolved Bush's ineffective assistance of counsel claim on the basis of the prejudice prong of the Strickland test.  More specifically, the OCCA concluded that Bush could not establish prejudice because he could not "overcome the presumption that the trial court did not rely on objectionable material." Id.  Implicit in that ruling was the OCCA's incorrect view, which we discussed in detail above, that it was permissible for victim impact witnesses to make sentencing recommendations.

The OCCA's ruling on Bush's ineffective assistance claim therefore "was contrary to . . . clearly established Federal law" because it rested on a misinterpretation of the

Supreme Court's decision in <u>Payne</u>.  Consequently, we must review de novo whether trial counsel was ineffective for failing to object to the victim impact testimony.  For essentially the reasons outlined above in the discussion of Issue Two (the admission of the victim impact evidence), we conclude that Bush was not prejudiced by his defense counsel's purported failure to object to the admission of the victim impact testimony.

*Issue Four – ineffective assistance of appellate counsel – failure to challenge trial counsel's failure to attack the constitutionality of the Oklahoma statute that bars defendants who plead guilty from being sentenced by a jury*

In his fourth issue on appeal, Bush argues that his direct appeal counsel was ineffective for failing to argue that trial counsel was ineffective for failing to attack the constitutionality of the Oklahoma statute that bars capital defendants who plead guilty from being sentenced by a jury.

*a) Facts relevant to the claim*

Bush's trial initially began with the seating of a jury and the presentation of witnesses by the prosecution.  After the prosecution had presented its second witness, Bush expressed a desire, against the advice of his trial counsel, to enter a blind plea of guilty.  "The [state] trial court conducted a plea hearing and allowed Bush to enter an *Alford* plea to first degree murder and a guilty plea to possession of a firearm after former conviction of a felony."[12]  <u>Bush II</u>, slip op. at 1–2 (footnote omitted).  During the plea

_____

[12] In <u>North Carolina v. Alford</u>, 400 U.S. 25, 37 (1970), the Supreme Court held that "an express admission of guilt . . . is not a constitutional requisite to the imposition of criminal penalty" and that, consequently, "[a]n individual accused of crime may

hearing, the state trial court stated: "Mr. Bush, I want to just make sure it's very clear to you that I'm going to be the one that's going to be determining your sentence at this time. And by entering this plea at this time you are waiving your right to have the jury hear the State's aggravating circumstances and the mitigating circumstances put on by your defence [sic] team; you understand that?" Tr., Vol. V at 994–95. Bush responded, "Yes." Id. at 995.

"The next day a non-jury sentencing proceeding commenced pursuant to [Okla. Stat. tit. 21, § 701.10(B)]." Bush II, slip op. at 2. Section 701.10(B) provided (and still provides): "If the trial jury has been waived by the defendant and the state, or if the defendant pleaded guilty or nolo contendere, the sentencing proceeding shall be conducted before the court." Okla. Stat. tit. 21, § 701.10(B). "Sometime during the first day of sentencing, Bush told the trial court that he wanted to withdraw his pleas, but the trial court denied his motion and advised him to wait until after being sentenced to move to withdraw the plea." Bush II, slip op. at 2.

"After being sentenced, and within the requisite ten day period, Bush filed a motion to withdraw his plea." Id. "The trial court held a hearing on the motion." Id. "During the hearing Bush stated that he did not want to withdraw his plea, thus, at the conclusion of the hearing, the trial court denied the motion." Id. "The trial court's

---

voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."

70

decision denying Bush's motion to withdraw plea was affirmed" by the OCCA on direct

appeal.  Id.

   *b) Bush's presentation of the claim to the OCCA*

   Bush first raised his claim of ineffective assistance of appellate counsel in his

application for state post-conviction relief.[13]  App. for Post Conviction Relief at 48.  The

OCCA rejected that claim on the merits.  Bush II, slip op. at 5–8.  In doing so, the OCCA

stated:

> Bush raises several substantive claims in his post-conviction application.  He also claims that either trial counsel and/or direct appeal counsel was ineffective for failing to raise these issues in earlier proceedings.  In examining the substantive claims and the ineffective assistance of trial counsel claims, we find that each of these claims is either waived, because issues could have been raised on direct appeal, or claims are barred by principles of *res judicata* because issues were raised on direct appeal.
>
> To overcome procedural bars and waiver, Bush claims, in proposition eight, that direct appeal counsel was ineffective for failing to raise these issues on direct appeal.  This is the only avenue of presenting these underlying issues, because the factual and legal basis for all of these claims was available to Bush on direct appeal.  See 22 O.S. 2011, § 1089(D)(4)(b)(2).  Bush must show that direct appeal counsel's failure to raise these issues amounted to deficient performance which resulted in prejudice. . . .
>
>          . . . .
>
> In the same vein, Bush clearly and affirmatively waived some issues presented in his post-conviction application by virtue of his entry of an *Alford* plea to first degree murder and his affirmative statement that he did not want to withdraw that plea.  Among the issues waived [wa]s the claim raised in his third proposition, where Bush argue[d] that non-jury

---

[13] Bush alleged that his appellate counsel should have (a) directly challenged the constitutionality of § 701.10(B), and (b) argued that Bush's trial attorneys were ineffective for failing to challenge the constitutionality of § 701.10(B).

sentencing after a guilty plea, in a death case, violates a defendant's constitutional rights to due process, to equal protection, to trial by jury, to be free from cruel and unusual punishment.

Bush claims that, in entering a plea to the charge, a forfeiture of the right to jury sentencing is created, instead of a valid waiver. He claims that this "coerced waiver or forfeiture" violates constitutional standards. On the contrary, the trial court made it clear that Bush was waiving jury sentencing, and Bush made an affirmative waiver, on the record.

Bush knowingly and voluntarily waived any perceived right to have a jury hear the State's evidence supporting the aggravating circumstances and any evidence supporting mitigating circumstances. At no time did he request to have the jury hear the sentencing proceeding. Bush never indicated that he was being forced to make a "Hobson's choice" in deciding to take his right to enter a plea versus his perceived right to have a jury determine his sentence. In fact, the choice to waive a jury can be a sound strategic decision. *See Kerr v. State*, 1987 OK CR 136, ¶ 12, 738 P.2d 1370, 1372. Because of this clear waiver, Bush cannot now claim error in the proceedings. Moreover, Bush cannot claim that either trial counsel or direct appeal counsel were ineffective in their failure to preserve any aspect of this claim, as he made a knowing and voluntary waiver of his jury rights.

. . . .

Examining the substantive claims, one by one, under the premise that direct appeal counsel was ineffective for failing to raise the claims does not reveal sufficient evidence to overcome the waiver hurdle, as Bush cannot show that the outcome of the trial would have been different but for the errors or that he is factually innocent.

. . . .

In proposition four, Bush cites many reasons why he believes trial counsel was ineffective. Proposition eight also argues that appellate counsel was ineffective for failing to raise ineffective assistance claims based on these reasons. These claims have been fully discussed above, as we found appellate counsel was not ineffective in failing to claim that trial counsel was ineffective in regard to issues outlined in propositions one, two, and three [proposition three alleged that § 701.10(B) was unconstitutional] . . . .

Id. at 3–10 (footnote omitted).[14]

    *c) Clearly established federal law applicable to the claim*

Bush's claim of ineffective assistance of appellate counsel is governed by the two-part test outlined in Strickland.  Given the nature of his claim, Bush "must establish that appellate counsel was 'objectively unreasonable' in failing to assert the claim on direct appeal, and that there is a reasonable probability that, but for counsel's failure to raise the issue, [Bush] would have prevailed in challenging his [death sentence] on direct appeal." Hain v. Gibson, 287 F.3d 1224, 1231 (10th Cir. 2002).

    *d) Analysis of the OCCA's decision*

The OCCA properly cited and applied the two-part Strickland test in considering and rejecting Bush's claim of ineffective assistance of appellate counsel.  And, in doing so, the OCCA expressly stated that it would not have ruled in Bush's favor had his appellate counsel argued on direct appeal that Bush's trial counsel was ineffective for failing to challenge the constitutionality of § 701.10(B).  Nothing about this determination constitutes an unreasonable application of Strickland.

Bush argues that, "[b]y the time of trial, the Colorado Supreme Court had invalidated a statute identical to § 701.10(B) as in violation of defendants' constitutional

---

[14] The omitted footnote read as follows: "The trial court stated: 'Mr Bush, I want to just make sure it's very clear to you that I'm going to be the one that's going to be determining your sentence at this time.  And by entering this plea at this time you are waiving your right to have the jury hear the State's aggravating circumstances and the mitigating circumstances put on by your defence [sic] team; you understand that?'  Bush replied: 'Yes.'  (Vol. V, Trial Transcript at 994–95, Oct. 22, 1999)." Bush II, slip op. at 6 n.3.

rights."  Aplt. Br. at 81 (citing People v. Montour, 157 P.3d 489, 499–500 (Colo. 2007)).

Bush further notes that "the South Dakota Supreme Court had held that 'a capital

sentencing scheme would be unconstitutional if it prevented a defendant who pleaded

guilty from having alleged aggravating circumstances found by a jury,'" id. at 81–82

(quoting State v. Piper, 709 S.W.2d 783, 803 (S.D. 2006)), and that "scholarly

commentators had attacked the constitutionality of statutes like § 701.10(B)," id. at 82.

Bush argues that "statutes like § 701.10(B) impermissibly require defendants to choose

between their Sixth Amendment right to a jury and their Eighth Amendment right to

present mitigating evidence."  Id. at 82.  He notes that "[m]any defendants in capital

cases plead guilty to demonstrate their remorse and acceptance of responsibility."  Id.

And he asserts that "statutes like § 701.10(B) require defendants to forgo their right to

demonstrate remorse and acceptance of responsibility in order to exercise their right to a

jury determination of death eligibility."  Id. at 83.

    Although Bush's arguments regarding the constitutionality of § 701.10(B) are

compelling, the constitutionality of § 701.10(B) is not an issue that is directly before us.

Instead, the issue at hand is whether Bush's appellate counsel was ineffective for failing

to raise that issue on direct appeal.  More specifically, the question is whether Bush

would have successfully challenged his death sentence had his appellate counsel raised

the issue on direct appeal.  Problematically for Bush, the OCCA has directly told us that

he would not have prevailed on direct appeal had his appellate counsel raised the issue,

primarily because it found that he expressly and knowingly waived his right to be

sentenced by a jury.  Finally, Bush has not established that the OCCA's conclusion on

that point is itself contrary to or an unreasonable application of clearly established federal law.  As noted, Bush relies almost exclusively on state court decisions to support his point.  The only Supreme Court opinion that he cites in his appellate brief regarding appellate counsel's allegedly deficient performance is Lockett v. Ohio, 438 U.S. 586 (1978); Bush's citation to this case is contained in footnote 12 of his appellate brief, and it includes no explanation of the relevance of Lockett.[15]  At issue in Lockett was an Ohio statute that "did not permit the sentencing judge to consider, as mitigating factors, [the capital defendant's] character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime."  438 U.S. at 597.  The Court "conclude[d] that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Id. at 604 (emphasis in original).  The Court explained that "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."  Id. at 605.  Notably, the Court's opinion implicitly presumed that a capital

---

[15] Elsewhere in his brief, Bush cites to two Supreme Court cases regarding waivers of the right to a jury.  Aplt. Br. at 86 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938), and Colorado v. Spring, 479 U.S. 564, 573 (1987)).  The voluntariness of Bush's waiver at trial, however, which was resolved by the OCCA on direct appeal, is not directly at issue before us.

defendant could be sentenced by a judge rather than a jury.  Further, the opinion simply did not involve a statute remotely similar to § 701.10(B).  Thus, the OCCA's conclusion that Bush was not prejudiced by his appellate counsel's failure to raise the issue on direct appeal cannot be said to be contrary to, or an unreasonable application of, Lockett.  We therefore conclude that Bush is not entitled to federal habeas relief on the basis of this claim.

*Issue Five – cumulative error*

In his fifth and final issue on appeal, Bush argues that "[t]he totality of the errors that marred [his] trial warrant relief under the due process clause."  Aplt. Br. at 88.

We have held "that when a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process.'"[16] Hanson v. Sherrod, 797 F.3d 810, 852 n.16 (10th Cir. 2015) (quoting Darks v. Mullin, 327 F.3d 1001, 1017 (10th Cir. 2003)).  "'A cumulative-error analysis merely aggregates all the errors that individually have [been] found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  Id. at 852 (quoting Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)).  "For [Bush] to receive

---

[16] Although we are bound by Tenth Circuit precedent on this issue, we note, in passing, that the Supreme Court has never recognized the concept of cumulative error. And, because there is no "clearly established Federal law" on this issue, we question whether a state appellate court's rejection of a cumulative error argument can justify federal habeas relief under the standards outlined in § 2254(d).

habeas relief, we must find that the cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Id. (quoting Brecht, 507 U.S. at 637). "This requires [Bush] to establish that the errors resulted in 'actual prejudice.'" Id. (quoting Brecht, 507 U.S. at 637).

Although the OCCA considered and rejected the merits of the cumulative error claim both on direct appeal and in the context of Bush's application for state post-conviction relief, we afford no deference to the OCCA's decisions because, as discussed above, it failed to recognize the impropriety of the admission of the testimony from the victim's family members. Consequently, we review Bush's cumulative error claim de novo.

As outlined above, we have identified the existence of three potential errors: (1) the admission of improper victim impact testimony; (2) ineffective assistance of trial counsel for failing to object to the improper victim impact testimony; and (3) ineffective assistance of appellate counsel for failing to argue that Bush's trial counsel was ineffective for failing to challenge the Oklahoma statute that bars capital defendants who plead guilty from having a jury determine their sentence. The problem for Bush, however, is that he has failed to establish that these errors, considered collectively, resulted in actual prejudice to him. In his appellate brief, Bush asserts that "[t]he illegitimate airing of Jackie Nash's allegations had a synergistic effect with the unconstitutional victim impact evidence." Aplt. Br. at 89. The problem with this argument is that, as we have discussed, we are not persuaded that any constitutional error resulted from the trial judge's consideration of the prosecution's offer of proof regarding

the testimony of Nash.  Bush also asserts in his appellate brief that "the violation of [his]

jury trial rights unfairly deprived him of the (admittedly remote) possibility that at least

one of twelve people participating in the sentencing decision may have been unaffected

by the onslaught of unfairly prejudicial evidence."  Id. at 90.  This "(admittedly remote)

possibility" is far from establishing the "actual prejudice" that is necessary to prevail on a

claim of cumulative error.  We therefore conclude that Bush is not entitled to federal

habeas relief on the basis of his cumulative error claim.

### III

The judgment of the district court is AFFIRMED.  Bush's motion to expand the

certificate of appealability is DENIED.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

June 10, 2019

Chris Wolpert
Chief Deputy Clerk

Ms. Virginia L. Grady
Mr. Josh Lee
Office of the Federal Public Defender
Districts of Colorado and Wyoming
633 17th Street, Suite 1000
Denver, CO 80202

Mr. Mark Henricksen
Henricksen & Henricksen, Lawyers, Inc.
600 North Walker, Suite 201
Oklahoma City, OK 73102

RE:   **16-6318, Bush v. Carpenter**
      Dist/Ag docket: 5:13-CV-00266-R

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:      Jennifer J. Dickson
         Caroline E.J. Hunt

EAS/as